R. P. SMITH and W. Dwight Little, copartners, d/b/a Cape Asphalt Paving Company, Appellant,

v.

J. W. GITHENS, d/b/a J. W. Githens Company, Respondent.

No. 7251.

Springfield Court of Appeals.

Missouri.

Sept. 13, 1954.

R. P. Smith, Cape Girardeau, for appellant.

Wangelin & Friedewald, Poplar Bluff, for respondent.

McDOWELL, Presiding Judge.

This appeal is by R. P. Smith, one of the plaintiffs, from a judgment of the Circuit Court of Butler County, Missouri, in an action on written contract to recover $4,656.90, the alleged balance due on 1,289.91 tons of asphalt concrete.

The petition is in two counts. The first count alleges that plaintiffs, R. P. Smith and W. Dwight Little, were partners in the operation of Cape Asphalt Paving Company, of which R. P. Smith was sole owner.

That defendant, J. W. Githens was engaged in the general contracting business under the firm name of J. W. Githens Company.

That on or about December 11, 1950, the parties entered into a written contract whereby plaintiffs agreed, as such contractors, to furnish asphalt concrete for runways of municipal airport for the City of Hornersville required by defendant's contract with said city at $10 per ton; that plaintiffs delivered 1,289.91 tons of asphalt and that there is still due and unpaid for said asphalt $4,656.90.

Count II states that plaintiff applied 2,890 gallons of Mc-O oil at an agreed price of ten cents per gallon and there is now due and unpaid for said oil $287 with interest.

Defendant's answer to count I of the petition admits the execution of the contract and pleads modification of the same by written agreement of the parties in accordance with a letter dated October 7, 1951. The answer further pleads that there was a mutual mistake in the drawing of the contract; that the agreed price was not $10 per ton as asserted therein but $1 per square yard and that defendant is indebted to plaintiff in the sum of $1,869.04 figured on the basis of $1 per square yard, subject to claims of interpleaders for supplies and materials furnished plaintiffs under the contract.

The answer to count II of the petition is a general denial.

The defendant's answer in the form of counterclaim seeks to recover damages in the sum of $2,230.12 caused by the failure of plaintiffs to begin work within ten days from the date of notice from defendant to do so, to wit, June 27, 1951. The counterclaim alleges that the work was not started until September 15, 1951.

Two issues are presented to this court for judgment. First, did the trial court err in reforming the contract because of mutual mistake of fact so as to read $1 per square yard instead of $10 per ton and in finding that there was a modification of the written contract by the parties after its execution so as to provide the price to be paid for the asphalt concrete was $1 per square yard?

The second issue involved is the sufficiency of the evidence to support the judgment of the trial court in favor of the defendant on defendant's counterclaim.

We will refer to appellant as plaintiff and to respondent as defendant.

Plaintiff first contends that there is insufficient evidence to support the court's finding of a mutual mistake of fact.

In determining this issue we consider all of the evidence.

The evidence is: R. P. Smith and W. Dwight Little were partners engaged in the asphalt concrete paving business under the name of Cape Asphalt Paving Company; J. W. Githens, defendant, was a general contractor d/b/a J. W. Githens Company.

Defendant obtained a contract from the City of Hornersville, Missouri, for grading, seeding and paving of the municipal airport.

Not being able to do the asphalt concrete surface work he sought out plaintiffs at Cape Girardeau, Missouri, to do this work. Smith is a lawyer and it was agreed that Little would make an investigation of the cost of materials to do the work and then bid on the furnishing of asphalt concrete for the purposes of laying the runways. Smith sent Little to Kennett to negotiate the contract. Little assisted Githens in preparing his bid on the airport job and figured the cost of laying the asphalt pavement on a square yard basis. Little and Githens both testified that they entered into an oral contract whereby plaintiffs were to furnish the asphalt paving for the runways of the airport for $1 per square yard.

Little transmitted the terms of the oral agreement to Smith, who prepared the contract. Smith stated that the terms submitted to him was $10 per ton for the asphalt so furnished and he so stated in the written contract. All the copies of the contract were turned over to Little and were, by him and defendant, executed in Little's car in the City of Kennett December 11, 1950.

Defendant admitted that he hurriedly read the contract before signing it; that it contained the term, "a sum equal to $10.00 per ton."

Little testified that at the time of the execution of the contract he thought the price to be paid was $1 per square yard. A copy of the contract was left with defendant who stated he lost it.

There was no objection by defendant as to the price of the concrete contained in the contract until after the work started in the middle of September, 1951. Smith wrote a letter, dated October 15, 1951, to defendant informing him that the base of the runways was in such condition as to require more asphalt concrete to lay the surface thereon. He stated that he was doing the work on a per ton basis and would not be hurt but that he thought defendant ought to know as he had bid the work in on the square yard basis.

Defendant, by letter dated October 17th, informed Smith that their contract was on a per square yard basis and unless he did the work on that basis to stop. On Monday, after receiving Smith's letter dated October 15th, defendant went to the airport and consulted Little, who endorsed on the back of Smith's letter, which is in evidence as plaintiff's exhibit No. 7, the following: "This letter is void and job is to proceed on basis of square yard as of $1.00 per agreement." Defendant offered this notation on the back of plaintiff's exhibit No. 7 as defendant's exhibit No. 2.

Little also signed a separate agreement with defendant in which he agreed that the contract sued on should be modified so as to read $1 per square yard. This separate agreement was not in evidence but made a part of the answer.

There was no record kept of the weights of the asphalt concrete furnished for the first week. Smith, upon learning about the matter, ordered the concrete weighed.

The city engineer testified that he made no check on the weights of the materials used; that Little had informed him that

the work was being done on a per yard basis. Little testified that he arrived at the weight of the pavement used for the first week by taking the number of loads used and averaging them with the weight of the loads used after they began weighing.

The evidence shows that after the work was completed plaintiff mailed statements to defendant showing the amount due figured on a per ton basis; that defendant never objected to the amount in the statements until the suit was filed.

Little, at the time of his deposition, was no longer a partner with Smith. His testimony clearly indicates his prejudice against Smith and his desire to aid defendant. The evidence on the part of Little is that he agreed with defendant to do the work on a per yard basis; that he told the city engineer in charge of the work and others that that was the original agreement.

■ This cause having been tried by the court without the aid of a jury, we review the case upon both the law and the evidence as in suits of an equitable nature and give due regard to the opportunity of the trial court to judge of the credibility of the witnesses. Scott v. Kempland, Mo.Sup., 264 S.W.2d 349, 355; Cosentino v. Heffelfinger, 360 Mo. 535, 229 S.W.2d 546, 549; Cross v. Gimlin, Mo. Sup., 256 S.W.2d 812; Section 510.310 RSMo 1949, V.A.M.S.

It is the contention of plaintiff that when the contract sued on herein was reduced to writing such writing expresses the final agreement, and it is presumed to merge all prior negotiations.

■ Plaintiff cites Poe v. Illinois Cent. R. Co., 339 Mo. 1025, 99 S.W.2d 82, 89. In this case the Supreme Court declared the law to be:

"Parties may contract without a writing. When the contract is reduced to writing, the writing expresses the final agreement, is presumed to merge all prior negotiations, becomes the highest evidence of the agreement, and possesses greater stability than a contract merely in parol. On the reliance of the stability of the writing, the parties alter their legal status. Fraud sounds in tort. The legal duty of the respective parties to a contract, depending of course on the circumstances attending the execution of the writing, to ascertain that the contents of the writing expresses their agreement is reciprocal. * * * Absent fraud, accident, or mistake, as stated by Judge Goode in Anderson v. Meyer Bros. Drug Co., 149 Mo.App. 554, 573, 130 S.W. 829, 835: 'It is trite law that a person is expected to learn what an instrument contains before he signs it, either by reading or having it read, or by having its contents stated by some one on whom he has a right to rely, the circumstances considered, and provided either method of obtaining the information is available without too great inconvenience.' * * * *"

■ In Phoenix Mut. Life Ins. Co. v. Goessling, Mo.App., 121 S.W.2d 182, 185, the court states the law:

" 'As between the original parties, if one has procured the signature of the other to a written agreement, whether by fraud or not, which does not contain the contract made by the parties, but a different one, he cannot be permitted to avail himself of that contract, but must stand by the one which was in fact entered into by both parties.' Wright v. McPike, 70 Mo. 175; Beck & Pauli Lithographing Co. v. Obert, supra [54 Mo.App. 240]; Chicago Fire & Marine Ins. Co. of Chicago, Ill. v. Hyde Park Congregational Church, 8 Cir., 35 F.2d 73; Storey v. Storey, 7 Cir., 214 F. 973."

Jennings v. Metropolitan Life Ins. Co., Mo.App., 166 S.W.2d 339, 344, cited by plaintiff, makes the following statement of law:

" * * * A mistake to justify a rescission of a contract must relate to the existence or non-existence of a fact, past or present, material to the contract, and not as to a future contingency. The mistake must be as to a matter of fact, not as to a matter resting in mere conjecture or belief. It must be as to a fact constituting the basis

of the contract. It must appear that knowledge of the fact would have prevented the making of the contract. * * *"

In 17 C.J.S., Contracts, §´142, page 495, the law is stated:

"A writing is not a contract when it fails to express that on which the minds of the parties met, and courts freely exercise the power to correct mistakes when the proof leaves no doubt that the real contract was something else. A mistake of expression occurs where the parties are of the same mind regarding the terms of the agreement, but the writing intended to embrace those terms does not express their true meaning. Here in courts of law the contract must stand as it is written, for it is a well settled rule of evidence in those courts that parol evidence is not admissible to contradict, add to, or vary a writing, as shown in the [32] C.J.S. title Evidence § 901, also 22 C.J. p. 1098 note 96. Equity may in a proper case grant relief by way of reformation, as considered in the [76] C.J.S. title Reformation of Instruments § 26, also 53 C.J. p. 931 note 19, or cancellation, as indicated in the title Cancellation of Instruments § 27."

A mutual mistake is one common to both or all parties, where each labors under the same misconception respecting a material fact, the terms of the agreement, or the provisions of the written instrument designed to embody such agreement. Misrepresentation of fraud is not essential to proof of a mutual mistake. 17 C.J.S., Contracts, § 144, page 497.

In Saline County v. Thorp, 337 Mo. 1140, 88 S.W.2d 183, 185, the court makes this statement of law:

" 'Reformation, and ordinarily rescission or cancellation, is only granted where there is a mutual mistake. However, there are exceptions made to these general rules in cases where the mistake of one party is either known to the other party or is so obvious, under the circumstances, that it must have been known to him, and the mistake concerns a matter so vital that it can be said that the parties, because of miscalculation or false information, never actually agreed to the same proposition.' "

A mistake of fact must be as to a fact which enters into and forms the very basis of the contract. 12 Am.Jur. pp. 618, 619, Sec. 126.

Under the evidence in this case the contract made by the parties was negotiated between the defendant and plaintiff's partner, Little, at Kennett. The undisputed evidence is that the contract originally made was to be $1 per square yard for asphalt pavement furnished. Plaintiff Smith never negotiated this contract. He merely put into writing the terms transmitted to him by his partner, Little. The written contract was a different one from that intended by the parties. It recited that defendant was to pay $10 per ton. In fact, it said a sum equal to $10 per ton. That expression, in itself, might have led to the defendant's failure to notice the mistake. However, both parties, one represented by Little and the other by defendant, himself, admit that the consideration for the asphalt concrete to be delivered was $1 per square yard.

Under the law as expressed in Phoenix Mut. Life Ins. Co. v. Goessling, supra, where the written agreement, whether procured by fraud or not, does not contain the contract made by the parties, but, a different one, plaintiff cannot avail himself under such contract but must stand by the one which was in fact entered into by both parties. See authorities cited in this opinion.

We find against plaintiff under this contention of error.

We, likewise, find against plaintiff under his second contention that the record is devoid of evidence to establish modification of contract.

In 12 Am.Jur. p. 1004, Sec. 427, the law is stated:

"It is entirely competent for the parties to a contract to modify or waive their rights under it and ingraft new terms upon it. The parties to a contract ordinarily are as free to change it after making it as they were to make it in the first instance, notwithstanding provisions in it designed to hamper such freedom. For instance, the time fixed for performance or payment may be enlarged by subsequent agreement. A subordinate and separable part of the contract may be waived or modified by the parties without a cancelation or avoidance of the whole contract. To be effective as a modification, the new agreement must possess all the elements necessary to form a contract. * * * Moreover, the assent of both parties to a modification is necessary. Such consent is required to vary a contract as much as to make one originally. * * *"

In 12 Am.Jur. p. 1006, Sec. 428, the law is stated:

" * * * The very purpose of the writing is to render the agreement more certain and to exclude parol evidence of it. Nevertheless, by the rules of the common law, it is competent for the parties to a simple contract in writing, before any breach of its provisions, altogether to waive, dissolve, or abandon it, or to add to, change, or modify it, or vary or qualify its terms, and thus make it a new one. * * *

"Parties to an executory contract, not within the statute of frauds or under seal, may change it by mutual consent so as to make it conform either to the actual agreement between the parties or to the agreement reached as a compromise of their differences arising out of the original contract."

Under the evidence in this case the Cape Asphalt Paving Company, represented by Little, and the defendant, before the alleged breach of contract, agreed to modify the contract sued upon to make it conform to the original intention of the parties. They signed a written agreement to that effect after a dispute arose as to the true meaning of the contract. We find against plaintiff on this assignment of error.

Plaintiff also raises the question that the trial court erred in permitting oral testimony to vary the terms of a written contract.

That is the general rule but there are exceptions to that rule and this is one of the exceptions. See cases cited under the other two points decided.

Under point 4 plaintiff complains of the trial court's finding in favor of defendant on defendant's counterclaim because there is no evidence to support the finding.

With this contention we agree. The trial court in its findings of fact and declaration of law made the following statement:

"The Court further finds and declares the facts to be that defendant was at all times ready to perform and did perform his part of the work on the airport paving job and that on numerous occasions he assisted plaintiffs financially in order to help them do their part of the work, but that plaintiffs failed or were unable to do their work on schedule and at the times requested by defendant and the City of Hornersville and as a result defendant had to do much of his work over again and was caused to expend sums of money for gravel, labor and equipment and was damaged thereby in the amount of $1657.00 * * *"

This statement by the court is in direct conflict with the pleadings and the evidence. Defendant's counterclaim, in part, states:

"That according to the terms of said contract plaintiff herein agreed to proceed with the work of applying the bituminous seal coat within a period of ten (10) days after notice given to plaintiff by defendant.

"That on or about the 27th day of June, 1951, defendant gave such notice to plaintiff in accordance with the agreement between the parties informing plaintiff that said runways were ready for the application of the bituminous seal coat.

"Defendant further states that plaintiff failed and neglected to proceed with the work within ten (10) days in accordance with said contract but on the contrary refused and neglected to proceed with said work until on or about the 15th of September, 1951.

"Defendant further states that by reason of such failure and neglect on the part of the plaintiff herein, the runways were washed and eroded by the weather and that a great amount of work and labor was necessitated on the part of the defendant to put the runways back in the condition they were in at the time of the expiration of ten (10) days after the notice given as hereinabove alleged.

"Defendant further states that because of said neglect and refusal to proceed on the part of the plaintiff herein, he was caused to expend for labor and materials to return said runways to their original condition, and was caused after completion of said runways to expend and use additional work, labor and incur additional equipment hire and repair and re-work grading work, which had eroded due to delay of performance on the part of plaintiff all to defendant's damage in the sum of Two Thousand Two Hundred and Thirty Dollars and Twelve Cents ($2,230.12)  *  *"

█ The law is that the issues to be tried are determined by the pleadings before the trial begins and limit the scope of the trial to these issues. Gerber v. Schutte Inv. Co., 354 Mo. 1246, 194 S.W.2d 25, 28.

The issue presented under this counterclaim was whether or not plaintiff violated the terms of the written contract sued on by failing to start the work within ten days after June 27, 1951, and not starting the same until September 15, 1951, and that said breach of contract, if any, damaged defendant in the manner and to the amount pleaded in the counterclaim.

█ The burden of proof to establish the cause of action alleged in the counterclaim was upon defendant. The written contract sued upon and offered in evidence reads, in part, as follows:

"In consideration of the payments hereinafter provided to be made by said first party, said second party hereby covenants and agrees to furnish all labor, materials and equipment, and to do all work necessary to prime and pave the areas indicated on the plans and specifications for said airport to be paved with asphalt paving.

"First party agrees to furnish and install the gravel or crushed stone base provided in said plans and specifications, and to shape and roll the same ready for application of pavement, Second Party covenants and agrees to prime the base so prepared by the first party, and to lay and install thereon an asphaltic concrete pavement not less than two inches in thickness after *compaction*. All such work by said second party shall be done in compliance with the plans and specifications and under the supervision of the engineer employed by the City of Hornersville.  *  *  *

"Second Party further covenants and agrees to commence said work of paving within ten days after notice from first party to do so, and to push such work to completion within thirty working days thereafter, unless prevented by weather or other conditions beyond the control of either party. First party will keep sufficient base, prepared and finished, ahead of such paving operation to permit continuous paving by second party after work has commenced."

It is the contention of the defendant, as stated in his counterclaim, that he gave notice to plaintiff to proceed with the work June 27, 1951. If defendant had the right to give such notice at that time it would have been the duty of plaintiff to proceed by July 7, 1951. Under the pleadings defendant admits that the work was started by plaintiff on or about the 15th day of September, 1951.

█ Under defendant's contract he was obligated to do more than to merely give notice to plaintiff to start the work. He was obligated to install the gravel or crushed stone base provided for in the specifications and to shape and roll the same ready for application of the pavement.

To sustain his case defendant offered the deposition of W. Dwight Little, who gave this testimony:

"Q. Do you know when the base was ready for your company to come in and begin its operations? A. I cannot recall the date or dates.

"Q. Do you know that the City of Hornersville through its Engineer Redman and your co-partners R. P. Smith had accepted the base? A. Yes, I am aware that Mr. Smith had been down there and they inspected it and accepted it.

"Q. Was your company then prepared to go in and begin its operations? A. We weren't right at that particular date.

"Q. And why weren't you able to proceed with the work following the acceptance of the base? A. We had a job at Caruthersville to finish up.

"Q. And that is the only reason you weren't able to go in there? A. That is the only reason I can recall right now.

"Q. I will ask you whether or not that the materials that were to be used on the Hornersville base were there and available? A. In the asphalt? I cannot recall definitely whether the stone was delivered previous to our moving in on the site with the plant or not.

"Q. I will ask you whether or not you knew that following the acceptance of Githens work that the contract called that your operations begin within ten days thereafter? A. That's correct.

"Q. I will ask you whether or not you began your operations within ten days following the acceptance? A. No, we did not."

The witness testified that he could not give dates; that he did not know when after the acceptance the operation started —whether it was as much as two months or less than two months. He testified, however, that the delay was not occasioned by the defendant.

On cross-examination the witness gave this testimony:

"Q. Do you have any recollection as to when the base was accepted? A. No, I do not.

"Q. This job was under the sponsorship of the Civil Aeronautics Administration, was it not? A. That's correct.

"Q. Do you recall that the Civil Aeronautics Administration and the City Engineer delayed accepting the base for a considerable period of time during the summer of 1951 because of the failure of the base to meet compaction tests, etc.? A. I recall the CAA objections to the base; yes."

The witness was handed a telegram, marked plaintiff's exhibit 6, from the Aeronautics Administration to Mr. Redman, dated June 18, 1951, a copy of which was received by the Cape Asphalt Paving Company, and admitted he had seen the telegram and then testified that the base was not ready then. He gave this testimony:

"Q. I will next show you what has been marked Plaintiff's Exhibit 7, consisting of two (2) sheets, which purports to be a copy of a letter from C. C. Redman, Jr., Engineer, to I. D. Marshall, Civil Aeronautics Administrations, dated September 3, 1951, and ask you whether or not the Cape Asphalt Paving Company in the regular course of business received that copy of letter through the mail? A. The best I can recall, yes.

"Q. And can you from examining that Exhibit, state whether or not the base on the Hornersville Airport was accepted for the laying of pavement as of that date; September 3, 1951? A. From this letter, I would make the statement that the base was not ready to receive pavement.

"Q. And after having refreshed your recollection from Exhibit 7, is that now your best recollection; that the base was not ready for the receiving of pavement on September 3, 1951? A. I would say that it had not been accepted by the Engineers involved, or representing the City of Hornersville.

"Q. *From Exhibit 7, the telegram from the CAA, is it true that we were not per-*

*mitted to begin the laying of pavement prior to acceptance of the base? A. That is correct.*

"Q. And from Exhibit 7, is it true that the base had not been accepted as of September 3, 1951? A. The Exhibit so indicates.

"Q. It is stated in the pleadings in this case that the laying of pavement commenced on or about September 15. Does that coincide with your recollection? A. The starting date is something I absolutely cannot recall. Memory fails me."

He testified that defendant's exhibit 3 showed material shipped September 28th and that paving could not have started before that but he did not remember when it started.

Little testified that before pavement could be put down the base had to be primed and that the prime material was different from that shown in the shipment of September 28th. He stated he did not know how long it was after the priming was finished before the paving was started; that between the prime work and the paving there was rainy weather that interrupted the work; that you could not lay asphalt during rainy weather. He testified that the job had to be accepted by the CAA and that Redman could be overruled as to acceptance and was.

Charles C. Redman, Jr., testified that he is a Civil Engineer and was in charge of the Hornersville project; that he represented the City of Hornersville. He gave this evidence:

"Q. Now, as engineer for the City of Hornersville, was it your duty to inspect or to accept the work that was going on there? A. Yes, sir.

"Q. Did you inspect and accept the work which consisted of the dirt work and the gravel, or actually the base that the J. W. Githens Company put there prior to the laying of asphalt? A. Yes, sir.

"Q. Do you know about when that acceptance was made? A. Again I would have to refer to my files, but it seems to me, if I remember correctly it was in August of 1951.

"Q. 1951? A. Yes, sir. I believe it was around the last two weeks of, during the last two weeks of August, in which we finally accepted the base.

"Q. Now, do you know how soon thereafter the Cape Paving Company got on the job? A. It was in September. Somewhere around the middle of September.

"Q. Now, do you, of your own knowledge, know whether or not there was any delay in the Cape Asphalt Company's operation on the Hornersville project? A. I don't know how I could answer that. The job was shut down from time to time. And I was given reasons, but as to actually verifying them myself, I don't know what all those circumstances were. I know sometimes it was due to rain, and sometimes it was due to unavailability of materials on the job. Other times Mr. Little frankly told me that he was having financial difficulties, whether that was so, I don't know, but there were a number of reasons given me.

"Q. During the time that Cape Paving Asphalt Company was operating there and laying their asphalt paving, was there a delay in their operations, which necessitated the Githens Company to come back in and do some basic work before they could continue? A. *I don't remember any after they finally got started paving.*

"Q. Was there any prior from the time that the base was accepted until the Cape Asphalt Paving Company began their operations? A. *In about June, May or June, I believe it was in May,* the bulk of the gravel base had been placed and processed and while we had not at that time taken full compaction tests, we felt at that time that the base was acceptable. Following the time when we did think the base was acceptable, a series of events occurred including rainy weather, traffic on the prepared base, which necessitated the reworking of that base by Mr. Githens a second time.

"Q. After the base was acceptable and before the time that someone had gotten in on the runway and damaged it, if the Cape Asphalt Paving Company had gotten in there, would that additional work have been eliminated? A. That is very difficult to answer. The base was prepared and to differentiate between workable and acceptable—the base we felt was acceptable at that time. It was smooth and firm. The rain coming of course permitted the water to work into the base and soften the particular surface of the base. Now, had some protective covering been placed on the sub-base surface so as to prevent the moisture from getting into the base, then of course the base would not have been so susceptible to distortion from traffic, but then again it would depend on the kind of protective measures taken because the weight of and shape of traffic on there, would have different effects."

On cross-examination this witness testified:

"Q. What portion of the pavement was subject to Federal controls? A. Well, the entire construction of the—every item on the field was subject to inspection by engineers and personnel of the Civil Aeronautics Administration to determine if the plans and specifications previously approved by them had been complied with and thereby the City of Hornersville could secure fifty per cent reimbursement of the construction costs.

"Q. And that included, did it not, the gravel base and the sub-grade which were to be set up by the Githens Construction Company? A. All items were subject to their inspection."

The witness testified that he sent a report to the CAA and requested permission to proceed and they sent the telegram marked exhibit "N", which read:

"No surfacing to be placed prior to receipt and approval by this office of compaction and gradation tests gravel base and compaction test subgrade."

"Q. Is it correct to say then Mr. Redman that on June 18, 1951, the gravel base and subgrade on Hornersville Airport project had not been accepted by the Civil Aeronautics Authority? A. That is correct.

"Q. So that there was no acceptance of the gravel base and subgrade prior to June 18? A. That is right."

The witness testified that on September 3, 1951, he wrote Mr. Marshall, CAA, enclosing the tests on the base and that the CAA had not approved the base at that time; that approval of the base was received September 6, 1951. He gave this answer: "A. I don't have a document to support it, but as I remember, immediately upon receiving the telegram I contacted either *Mr. Githens and Mr. Little or Mr. Githens* and asked them to proceed.

"Q. With the application of the asphalt? A. That is right.

"Q. *Between September 5th and 6th, or whatever date you received your approval, and the date that the Cape Asphalt Paving Company moved onto the job and began working, was any additional work done on the gravel base or subgrade by Mr. Githens? A. I don't believe that there was from that time.*

"Q. Now, I believe you stated on Direct Examination that the base was acceptable the latter part of May, 1951? A. I stated in my opinion it was acceptable in the latter part of May.

"Q. And operations as far as the asphalt paving company was concerned, could have proceeded after that date? A. Subject to having secured the formal approval of CAA."

Defendant, J. W. Githens, testified:

"Q. On or about what date had the J. W. Githens Company completed their portion of the work on the Hornersville Airport? A. I have to check, excuse me, these are my daily payrolls and reports. Along about May 19, 1952." (The witness later corrected this date to 1951.)

"Q. Now, was that the date that the base down there was acceptable? A. Along about that date, after we finished

our grading and putting the surface, the gravel base down, Mr. Redman and Mr. Smith came to the airport and as I recall, it was on a Sunday afternoon. We walked over the job. Mr. Smith said it looked good enough to him. There were a few minor depressions, possibly ten or twelve or fifteen feet in diameter, but like I said, they were minor and he said that they would correct that when they put the asphalt down.

"Q. So that on or about the 19th day of May then, the base was ready for the Cape Asphalt Paving Company to come in and begin their operations, is that correct? A. That was one of the times. May I explain that we had it ready possibly as high as three times but they never got there and we kept going back and doing it over and over."

This witness testified that the base was acceptable on May 19th and that because plaintiff did not go in at that time he had to keep his men off of their other jobs.

Why the court permitted this kind of testimony under the pleadings we do not know for defendant did not contend that he gave Smith notice to proceed under the contract until June 27th, and, of course, the plaintiff had ten days from that date to proceed. Yet, defendant testified he had to go in from time to time and prepare the base. This testimony was not admissible under the pleadings. We want to point out here that plaintiff objected to this testimony and defendant's attorney claimed that it was admissible under the counterclaim to show that defendant had to return for additional work.

This testimony was offered:

"Q. What was the first time, the date after May 19th, that you and your men went back into the Airport Project and began to redo the work? A. The week of July 23rd to the 29th, we had our men back in there."

This testimony was objected to on the part of plaintiff for the reason that the evidence showed that the base was not completed until the 5th or 6th of September, and was, by the court, overruled. The witness was then permitted to show the number of men required to redo the work at that time and the amount he paid for such work. He gave this testimony:

"Q. Now, was the work done that week done on the base itself or on some other part? A. That was redoing the base after the rains had gotten underneath the subgrade and offset it.

"Q. Now, what was the date, what week? A. That was the week of July 23rd to the 29th.

"Q. Now, following that, what was the next period that your men worked on that? A. The next week was July 30th to August 4th.

"Q. And how many men worked on it during that week? A. Three men that week."

Again, the witness was permitted to testify as to the amount of money he had to pay to redo this work. He then gave this testimony:

"Q. Now, was there anytime following that that you worked on the base? A. Yes, the following week we had one man for sixty dollars.

"Q. And following that, was any other work done on the base? A. *There was no work done.*"

This witness was permitted to testify that he had to bring his equipment back on the job, graders and rollers to redo this work and the cost he was out in redoing it.

Plaintiff testified, of course, that there was no delay in the beginning of this work after the base was accepted and plaintiff was notified.

Disregarding plaintiff's testimony entirely, defendant wholly failed to offer substantial evidence to support his counterclaim. Defendant's witness, Redman, the engineer in charge of the work, testified that the entire construction of the airport, every item on the field was subject to the

inspection of the engineers and personnel of the Civil Aeronautics Administration to determine if the plans and specifications previously approved by them had been complied with so the City of Hornersville could secure fifty per cent reimbursement of the construction cost; that this included the gravel base and the sub-grade to be set up by Githens Construction Company. He identified a telegram received by him on June 18, 1951, from the Government which, in part, read: "No surfacing to be placed prior to receipt and approval by this office of compaction and gradation tests gravel base and compaction tests subgrade," and signed by I. D. Marshall, Civil Aeronautics Administration.

Under the written contract, sued on herein, it is provided: " * * * Second Party covenants and agrees to prime the base so prepared by first party, and to lay and install thereon an asphaltic concrete pavement not less than two inches in thickness after compaction. All such work by said second party shall be done in compliance with the plans and specifications and under the supervision of the engineer employed by the City of Hornersville."

Defendant does not deny that this base had not been accepted June 18, 1951, and Redman specifically testified that it had not been. Redman, testifying for defendant, gave this testimony:

"Q. Did you also state in that letter, is it not correct that you would have to have the written approval of the CAA before you could proceed with any surfacing, is that correct? A. That is correct."

The letter referred to was a letter written June 19, 1951, to W. D. Little, one of plaintiffs, by Redman, in which he stated that since they had not moved in their equipment an inspection of the sub-base and gravel sub-base revealed that the required compaction had not been reached, and suggested that Little arrange with Githens to secure such grading and compaction yet required and informed him that they would have to have the compaction approved by the CAA. The witness also identified a letter, dated June 25th, which he had written to Githens calling his attention to the fact that the grading and compaction were required on the gravel base.

Witness Redman was handed plaintiff's exhibit "Q" and identified it as a letter written September 3, 1951, from Redman to Mr. Marshall, District Engineer, CAA, in which he enclosed reports of tests on the base, materials and road gravel for the project and calling attention to certain discrepancies from a previous test sent in and then he gave this testimony:

"Q. Would it be correct to state then Mr. Redman that on September 3rd, 1951, no approval had been secured from the Civil Aeronautics Administration of the gravel base and sub-grade? A. That would so indicate.

"Q. This letter, does it not, seeks that authority, that approval? A. That is right.

"Q. Can you state on what date after September 3, 1951, you did receive such approval? A. I have here a letter dated September 6, which states this letter is to confirm our telegram sent yesterday approving the gradation and compaction tests, and authorizing the work to proceed.

"Q. * * * Can you state on what date after September 5th or 6th you first notified Mr. Githens of the CAA approval of the gravel base? A. I don't have a document to support it, but as I remember, immediately upon receiving the telegram I contacted either Mr. Githens and Mr. Little or Mr. Githens and asked them to proceed.

"Q. With the application of the asphalt? A. That is right."

From this testimony the court is fully convinced that there was no obligation under the contract sued on requiring plaintiffs to proceed with the work until ten days after the 5th or 6th of September, 1951. Both Redman and the defendant testified they did no work sued for in this counterclaim after the work was started. Defendant's answer admits the work started about September 15th and plaintiff says about the 18th. But, considering either

date as correct, there is no testimony in the record that any work was done by defendant after the 5th or 6th of September, 1951. Defendant testified the last work was done in August.

The contract provides that the compaction tests must be made before plaintiffs could proceed with work and all of the testimony shows that that test was not met until about September 6th.

Under allegation of error numbered 5, plaintiff complains that the judgment is defective in that it fails to determine all of the issues presented by the pleadings.

In plaintiff's argument he makes this statement:

" * * * the Court refused to rule on the issues as to the defaulting interpleaders, Daves Coal Co., Cotton Belt Railroad Co., and Standard Oil Company. In spite of specific requests made at the opening and at the close of the trial below, the judgment is silent as to the alleged claims of these parties, and thereby fails to 'determine the rights of all parties to the action.' "

█ On motion of defendant the court ordered these parties to interplead. The record shows they were properly served by summons but failed to interplead. There was nothing to pass upon in the case as no claim was made by these parties.

We find there is no merit under this assignment of error.

Judgment reversed with instructions that judgment of the trial court finding for defendant on defendant's counterclaim to count I of plaintiff's petition for $1,675 be set aside and judgment be entered for plaintiff on said counterclaim and that the trial court's judgment be affirmed in all other particulars.

STONE, J., concurs.