Charles A. RIMER and Dorothy Rimer, husband and wife, Plaintiffs-Respondents,

v.

Floyd HUBBERT, Defendant-Appellant.

No. 8793.

Springfield Court of Appeals.

Missouri.

Jan. 14, 1969.

Claude Arnold, Dexter, for defendant-appellant.

Powell, Ringer & Baker, Dexter, for plaintiffs-respondents.

STONE, Judge.

In this jury-waived action at law for money had and received, plaintiffs Charles A. Rimer and Dorothy Rimer, husband and wife, obtained a judgment for $1,020, including interest in the sum of $20, against defendant Floyd Hubbert, who here appeals.

On April 12, 1967, a written "Contract for the Sale of Real Estate" (hereinafter referred to as the written contract), which had been prepared by defendant's attorney, was executed by defendant Hubbert as the seller and by *both plaintiffs* as the buyers. By and in the written contract, defendant agreed to sell to plaintiffs and they agreed to buy from defendant Lot 5 of Block 7 of Chautauqua Park Third Addition in the City of Dexter, Missouri (hereinafter referred to as the lot in Block 7), for the sum of $12,500, of which $1,000 then was paid by plaintiffs to defendant "as earnest money" and the remainder of $11,500 was to become payable as soon as a dwelling, to be constructed on said lot by defendant "according to the blueprints hereto attached and made a part of this Agreement," was "completed and ready for occupancy." For reasons not disclosed in evidence, no blueprints were attached to the written contract and no dwelling was constructed or even commenced on the lot in Block 7.

Plaintiff Charles A. Rimer was employed by defendant, a carpenter and contractor who owned several lots in the same addition and was building houses for sale. Several weeks after execution and delivery of the written contract, "possibly" in May 1967 so plaintiff Charles testified, *he* and defendant orally agreed that a dwelling would not be built on the lot in Block 7; and, apparently at or about the same time (although the record is not definite as to this), *plaintiff Charles* talked with defendant about the purchase "upon completion" of a dwelling then "under construction . . . near half completion" on Lot 5 in Block 6 of the same addition (hereinafter referred to as the lot in Block 6). "The price of [that] house was to be $12,750." Defendant's record explanation of the difference between that figure and the $12,500 specified in the written contract for a dwelling on the lot in Block 7 was that "*he* [plaintiff Charles] wanted built-ins in this one" on the lot in Block 6 and that "*he* picked out the color of paneling that *he* wanted for each room." (All emphasis herein is ours.) Defendant also stated that "a better grade" of carpet was used in the house on the lot in Block 6, but "I give *him* that extra."

Plaintiff Charles was employed on construction of the house in Block 6 at the time of his conversation with defendant about purchasing it "upon completion," and he continued on that job until the house was finished "probably in the last week of June" 1967. About that same time, *plaintiff Charles* (accompanied by defendant) went to the Poplar Bluff Loan and Building Association where (in defendant's words "*he* signed the application [for a loan of $11,700] and put up the appraisal money" of $15. Following appraisal, the loan was "approved" but thereafter "was cancelled" and never closed. Plaintiff Charles said that he was told "they would not go ahead with the loan . . . because I wasn't working at the time." As he explained, "when I first started working for him [defendant] he said that he should have work to keep me working all the time" but, when the house on the lot in Block 6 was completed, "he said he didn't have any more work for me until he could sell some of his houses he had for sale."

In response to his counsel's inquiry as to when he "found out that *Mr. Rimer* didn't want to accept this house" on the lot in Block 6, defendant said "probably two weeks" after the loan was approved—"I'd say in the middle of July" 1967. Ensuing inquiries "as to why *he* was not taking the property" elicited these answers: *"He told me his wife wouldn't sign the deed* [of trust]"—"*well, as I said while ago, he just told me his wife wouldn't sign the papers."*

Although title was never conveyed to him, *plaintiff Charles* subsequently listed the house and lot in Block 6 with a Dexter realtor for sale at $13,500. His attempted explanation that he did so "after [defendant] said if I could find another buyer—" was interrupted by defendant's counsel and never completed. No sale was effected by

the realtor, but on August 29, 1967, defendant himself sold and conveyed that house and lot to purchasers (not named in the record) at a price "the same as it was to *Mr. Rimer*," namely, $12,750. *Plaintiff Dorothy Rimer* did not testify.

Defendant's theory of the case has been and is that the parties to the written contract, subsequent to the execution thereof but before any work was done on the lot in Block 7, by their oral agreement effected a modification of the written contract; that, upon defendant's full performance of the oral modification, it was removed from the prohibition of the statute of frauds, V.A.M.S. § 432.010 [Deu Friend v. McDermott, Mo.App., 251 S.W.2d 339, 342(6)], and "the modified contract" was enforceable against plaintiffs; and that "plaintiffs' failure to accept the building [on the lot in Block 6] and . . . to pay the defendant, as provided under the modified contract, constituted a breach thereof and, therefore, the defendant was entitled to retain the sum of $1,000 so paid down as earnest money for liquidated damages."

■ Obviously, the acceptability of defendant's theory depends, in the first instance, on the validity vel non of the premise that there was an effective oral agreement modifying the written contract. As pointed out in plaintiffs' brief, the assent of *all* parties to a written contract is an indispensable element of an oral modification thereof. Smith v. Githens, Mo.App., 271 S.W.2d 374, 380(18); 17 Am.Jur.2d Contracts § 465, l.c. 935; 17A C.J.S. Contracts § 375, p. 425. Defendant as the seller and *both* plaintiffs as the buyers were parties to the written contract. Assuming arguendo that *plaintiff Charles* and defendant did assent to the proposed oral modification, there yet remains for consideration the provocative question as to whether or not *plaintiff Dorothy* so assented—a question suggested on the face of the record, urged by plaintiffs' counsel, and in our view dispositive of this appeal.

A searching examination of all of the evidence in any wise pertaining to the alleged oral modification or to the house on the lot in Block 6 discloses only two references to *plaintiff Dorothy*, those being in the hereinbefore-quoted answers of defendant: "He [plaintiff Charles] told me his wife [plaintiff Dorothy] wouldn't sign the deed [of trust]"—"well, as I said while ago, he just told me his wife wouldn't sign the papers." Otherwise *all* of such evidence related only to the alleged words and deeds of *plaintiff Charles*.

■ A husband is not authorized, merely by reason of his marital relation, to alter or modify his wife's contract [McCollum v. Boughton, 132 Mo. 601, 610, 30 S.W. 1028, 1030, 35 L.R.A. 480, affirmed on rehearing in banc 132 Mo. 601, 612, 33 S.W. 476, rehearing denied 132 Mo. 601, 617, 34 S.W. 480], and a wife is not bound by a material alteration of a contract by her husband, which she neither authorizes nor ratifies. Slaughter v. Elliott, 138 Mo. App. 692, 699–700, 119 S.W. 481, 484(2). See Wussler v. Peterson, Mo., 270 S.W.2d 12, 15–16(3); Kines v. Jamison, Mo.App., 277 S.W. 969, 972(3). Of course, the agency of a husband to act for his wife may be shown by direct evidence or by facts and circumstances which would justify a reasonable and logical inference that he was empowered to act for her or that she ratified his unauthorized acts. Ethridge v. Perryman, Mo., 363 S.W.2d 696, 701(6); 41 C.J.S. Husband and Wife § 70, p. 548. But in the case at bar there was neither direct evidence of plaintiff Charles' agency to act for plaintiff Dorothy nor a showing of facts and circumstances from which either his agency or her ratification might be reasonably and logically inferred. Cf. Dierks & Sons Lumber Co. v. Morris, Mo.App., 404 S.W.2d 229. For that matter, it was not shown that plaintiff Charles ever purported to act for his wife, and the only evidence pertaining to her, i.e., that she refused to "sign the papers," tended to negate authorization or ratification.

**8**

The alleged oral modification of the written contract was pleaded by defendant as an affirmative defense [V.A.M.R. Rule 55.10; V.A.M.S. § 509.090], and the burden of proving it rested on him. Mochar Sales Co. v. Meyer, Mo., 373 S.W.2d 911, 914(2); Gennari v. Prudential Ins. Co. of America, Mo., 335 S.W.2d 55, 60(2); Mohawk Real Estate Sales, Inc. v. Crecelius, Mo.App., 424 S.W.2d 86, 91(8). There was a complete failure of proof as to that defense, and no other theory has been suggested by defendant, either in the trial court or on appeal, in justification of his continued retention of the $1,000 earnest money paid under the written contract. On the record presented, it appears that an action for money had and received will lie [cf. Griesenauer v. Belleau Lake Development Co., Mo.App., 421 S.W.2d 785, 789(5); Keane v. Beard, 11 Mo.App. 10, 20; 58 C.J.S. Money Received § 5, p. 915; Id. § 12, p. 922] and that we may not say the judgment nisi was "clearly erroneous." V.A.M.R. Rule 73.01(d); V.A.M.S. § 510.310(4).

Accordingly, the judgment for plaintiffs is affirmed.

HOGAN, P. J., and TITUS, J., concur.