# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 03-3824

———————

Shurgard Storage Centers,

          Appellee,

v.

Lipton-U. City, LLC,

          Appellant.

Appeal from the United States
District Court for the Eastern
District of Missouri.

———————

Submitted: September 16, 2004
Filed: January 12, 2005

———————

Before LOKEN, Chief Judge, BEAM and SMITH, Circuit Judges.

———————

SMITH, Circuit Judge.

Lipton-U. City, LLC ("Lipton") and Shurgard Storage Centers ("Shurgard") entered into a lease agreement with a purchase option. Shurgard subsequently discovered a major problem with the price term of the agreement when Lipton attempted to exercise it. Shurgard sought reformation or rescission of the sale provision. After a trial on the merits, the district court[1] ordered rescission finding the disputed contract term to be unconscionable. Judgment was entered in Shurgard's favor and Lipton now appeals. We affirm.

---

[1]The Honorable Terry I. Adelman, United States Magistrate Judge for the Eastern District of Missouri.

I. *Background*

In 1996, a representative of Lipton contacted Shurgard to discuss the purchase of three self-storage facilities in the St. Louis area, including a facility located on Olive Boulevard. Because no agreement could be reached on price, these negotiations failed. In 1998, Lipton renewed its interest in purchasing the three properties and made a second offer of $12,311,452.00. The Olive Boulevard property accounted for $6,913,418.00 of that total price. This calculation was based on an annual net-operating income and a 9.5% capitalization rate. After a due diligence review of the properties, Lipton became concerned about an existing environmental condition at the Olive Boulevard property. Given the buyer's concerns, the parties agreed to a lease, rather than a sale of the Olive Boulevard property. Shurgard drafted and circulated a lease agreement to Lipton's and Shurgard's negotiators. The proposed lease contained a purchase option provision, which was based on a formula using twelve months of projected net-operating income and a capitalization rate of 10%. As negotiations progressed, Lipton, through its representative, Donn Lipton, expressed concern about the value it would receive given the purchase price and the environmental condition of the Olive Boulevard property. Donn Lipton threatened to terminate purchase negotiations if Shurgard did not make some significant concessions. Donn Lipton also made clear that he expected a 20% return.

Shurgard suggested a compromise regarding the definition or basis for net-operating income and forwarded a spreadsheet showing values for the Olive Boulevard property ranging from $7.5 million to $8.5 million. Shurgard also suggested that the parties use a 9.6% capitalization rate on a historic net-operating income using results from the immediate past six months of business. Lipton disregarded the spreadsheet, but noted that the lease payments would be $654,000.00. Lipton's representatives saw the deal favorably, and using annualized figures, projected that the value of the property would increase from approximately $7.2 million to about $7.9 million in five years.

Given this forecast, Donn Lipton accepted Shurgard's compromise offer of a 9.6% capitalization rate on six-months of trailing net-operating income. Unfortunately, the parties did not make their agreement abundantly clear. Donn Lipton interpreted Shurgard's compromise to be a substantial price reduction by using six-months of net-operating income instead of annualized or twelve-months of net-operating income. Thus, Shurgard believed the purchase price would be based upon a full-year of net-operating income and Donn Lipton believed the price would be based upon six months of net-operating income. Shortly thereafter, Donn Lipton and Shurgard discussed the deal and Shurgard requested that the parties fix the six-month period as either January through June or July through December.

On October 11, 1999, Shurgard representatives, who were drafting the lease, circulated an internal e-mail memorandum describing its terms. The memorandum indicated that the lease should apply a 9.6% capitalization rate on the *annualized* net-operating income for the latest six-month period, January 1 through July or July 1 through December 31, multiplied by two. The net-operating income was to be determined by applying standard generally-accepted accounting principles[2] as consistently applied by Shurgard. Shurgard copied Lipton representatives on this e-mail memorandum and there are no records that anyone from Lipton disputed its accuracy or contended net-operating income should not have been annualized.

The next day, Shurgard revised the lease pursuant to the earlier e-mail and circulated the updated version. The updated lease inexplicably omitted any language regarding multiplying by two or annualizing the net-operating income. Section 2.4 of the updated lease did, however, incorporate a capitalization rate of 9.6% and a definition of net-operating income to be based on a set six-month period. After

---

[2]Keith Allair, an investment banker concentrating in the self-storage industry testified that annualized net-operating income is universally used in valuation calculations.

receiving a copy of the lease, Donn Lipton announced to his company's attorneys that the lease reflected his successful negotiation of a purchase option price based on six-months of *unannualized* net-operating income.

The parties continued to negotiate other terms of the lease, specifically other provisions in section 2.4 and the fee mortgage provision found in section 1.15. At the end of their negotiations, Shurgard's board of directors met to consider final approval of the lease proposal. At that time, a copy of the lease was provided to each member of the board. The board approved the lease and the parties signed the final draft. The contract specified a ten-year lease term and set the initial annual rent at $636,000.00 based on a property valuation of approximately $7 million.

About eight months after signing the lease, Lipton expressed an intent to exercise the purchase option under section 2.4 and stated a price of $2,918,103.70. Lipton calculated the price based on six-months of unannualized net-operating income. Shurgard rejected this offer and filed suit in district court seeking reformation or rescission citing the parties' misunderstanding about the price term. Count II of Shurgard's First Amended Complaint, labeled "Rescission," specifically alleged that:

> Lipton knew and understood that Shurgard had instructed its attorney to specify the use of annualized . . . [net-operating income] in the calculation of the purchase option price, and Lipton further knew and understood that Shurgard executed the Lease Agreement . . . in the mistaken belief that the language of the Lease Agreement as executed called for such use of annualized . . . [net-operating income] in the calculation of the purchase option price.

> * * *

> Shurgard would not have agreed to enter into the Lease Agreement if it had known that the calculation of the purchase option price in Section

2.4 of the Lease Agreement failed to require the use of annualized . . . [net-operating income] as the parties had agreed, and Shurgard would never have agreed to sell the Property to Lipton at a price that in effect reflects only half of its true value.

At the end of the non-jury trial, the district court rejected Shurgard's mutual mistake and fraud theories. However, the district court ordered rescission based on unconscionability. The court found that Donn Lipton should have known that Shurgard intended to annualize the net-operating income because he was copied on the October 11 e-mail detailing the contract terms. The court reasoned that it would be unconscionable to allow Lipton to purchase the Olive Boulevard property at half its value based upon the lack of clarity of the price term. Lipton now seeks reversal of the district court's order of rescission and judgment in favor of Shurgard.

## II. *Discussion*

The parties agree that Missouri law applies. We review the district court's interpretation of state law de novo. *Kolb v. Paul Revere Life Ins. Co.*, 355 F.3d 1132, 1134 (8th Cir. 2004). Under Missouri law, "rescission may be granted when the other party knows of the mistake or if the mistake is so obvious that it should have been known or when enforcement of the contract would be unconscionable and relief would impose no substantial hardship on the other party." *Kassebaum v. Kassebaum*, 42 S.W.3d 685, 695 (Mo. Ct. App. 2001). Moreover, "there is practically universal agreement that, [under Missouri law] if the material mistake of one party was caused by the other, either purposely or innocently, or was known to him, or was of such character and accompanied by such circumstances that he had reason to know of it, the mistaken party has a right to rescission [of the contract]." *Silver Dollar City, Inc. v. Kitsmiller Constr. Co., Inc.*, 931 S.W.2d 909, 915 (Mo. Ct. App. 1996). The Missouri Court of Appeals in *Silver Dollar City* relies heavily on § 153 of the Restatement (Second) of Contracts, which provides:

[w]here a mistake of one party at the time a contract was made as to a basic assumption on which he made the contract has a material effect on the agreed exchange of performances that is adverse to him, the contract is voidable by him if he does not bear the risk of the mistake under the rule stated in § 154, and (a) the effect of the mistake is such that enforcement of the contract would be unconscionable, or (b) the other party had reason to know of the mistake or his fault caused the mistake.

Restatement (Second) of Contracts § 153. *See also Silver Dollar City*, 931 S.W.2d at 913–18.

Lipton acknowledges the holdings of *Kassebaum* and *Silver Dollar*. However, Lipton argues that § 153 of the Restatement is inapplicable because the mistake in this case is one of expression rather than a mistake of an underlying fact. Lipton relies on the introductory note contained in Chapter 6 of the Restatement, which provides:

The type of mistake dealt with in this Chapter is one that relates to existing facts that the parties regard as a basis for making an agreement. An important sub-category of such mistake is mistake as to expression, in which the mistake relates to the contents or effect of a writing that expresses an agreement. In general, the appropriate relief for mistake takes the form of avoidance of the contract.

* * *

If there is a mistake of only one party as to expression, avoidance may be an appropriate remedy under the rule stated in § 153 . . . . If, however, his mistake is in believing that a writing correctly expresses a prior agreement and the other party knows that it does not correctly express that agreement, the problem is one of the effect of the latter's failure to disclose this fact. This is dealt with in §§ 160–61, together with other instances in which nondisclosure may be tantamount to misrepresentation.

Restatement (Second) of Contracts ch. 6, introductory note. Under Missouri law,"[a] mistake of expression occurs where the parties are of the same mind regarding the terms of the agreement, but the writing intended to embrace those terms does not express their true meaning." *Smith v. Githens*, 271 S.W.2d 374, 379 (Mo. Ct. App. 1954). Lipton and Shurgard were not of the same mind regarding the terms of the agreement, as Lipton thought the contract was based on unannualized net-operating income and Shurgard thought that the contract was based on annualized net-operating income. The mistake here is not one of expression and the district court correctly decided this case under § 153 of the Restatement.

Lipton also disputes two of the district court's findings of fact: (1) that Donn Lipton knew or should have known of Shurgard's mistake of fact and (2) that the price offered by Lipton was half of the value of the property. Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the district court to judge the credibility of the witnesses. Fed. R. Civ. P. 52(a). This standard of review does not permit a court of appeals to substitute its own impressions for those of the district court. *Adzick v. UNUM Life Ins. Co.*, 351 F.3d 883, 889 (8th Cir. 2003). Moreover, "[w]hen findings are based on determinations regarding the credibility of witnesses, Rule 52 demands even greater deference to the . . . [district] court's findings, and unless contradicted by extrinsic evidence or internally inconsistent, such findings can virtually never be clear error." *Id.*

Based upon our review, we hold the district court was not clearly erroneous in holding that Donn Lipton knew or should have known of Shurgard's mistake. Donn Lipton was notified via e-mail that Shurgard thought the 9.6% capitalization rate would be based on annualized net-operating income. Donn Lipton knew that section 2.4 of the lease did not apply the 9.6% capitalization rate on annualized net-operating income and informed his attorneys that the lease reflected his successful negotiation

of a purchase-option price based on six-months of unannualized net-operating income.

Furthermore, the record contained sufficient evidence for the district court to conclude that the Olive Boulevard property should have been valued at approximately $7 million. Specifically, Shurgard suggested a compromise regarding the definition or basis for net-operating income and sent Donn Lipton a spreadsheet showing values ranging from $7.5 million to $8.5 million. Shurgard also suggested that the parties use a 9.6% capitalization rate on a historic net-operating income using the immediate past six months of data. Lipton representatives thought the 9.6% capitalization rate on a historic net-operating income was good, and using annualized figures, projected that value of the property would increase from approximately $7.2 million to about $7.9 million in five years. This all occurred after Lipton's due diligence review.

Lipton also argues that the district court erred in its equitable balancing of the parties. Specifically, Lipton disputes the district court's findings of unconscionability on two grounds: (1) Shurgard failed to plead unconscionability in its amended complaint and (2) Lipton was substantially and materially prejudiced by the exercise of the district court's equitable powers. Rule 54(b) of the Federal Rules of Civil Procedure permits:

> the district court to 'direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay.' In determining that there is 'no just reason for delay,' the district court must consider both the equities of the situation and 'judicial administrative interests,' particularly the interest in preventing piecemeal appeals. Applying the abuse of discretion standard of review, . . . [this court] largely defer[s] to the district court's weighing of the equities.

*See Interstate Power Co. v. Kansas City Power & Light Co.*, 992 F.2d 804, 806–07 (8th Cir. 1993) (citing *Curtiss-Wright Corp. v. General Elec. Co.*, 446 U.S. 1, 8, 10 (1980)).

Lipton maintains that because of Shurgard's failure to plead unconscionability in its original or amended complaints, Lipton was not afforded an opportunity to conduct proper discovery to develop evidence on the issue. Under the liberal notice pleading standards of the Federal Rules of Civil Procedure, Shurgard was only required to give "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). Moreover, "[a]ll pleadings should be construed to do substantial justice." Fed. R. Civ. P. 8(f). Count II of Shurgard's First Amended Complaint, labeled "Rescission," specifically alleges that:

> Lipton knew and understood that Shurgard had instructed its attorney to specify the use of annualized . . . [net-operating income] in the calculation of the purchase option price, and Lipton further knew and understood that Shurgard executed the Lease Agreement on about November 10, 1999 in the mistaken belief that the language of the Lease Agreement as executed called for such use of annualized . . . [net-operating income] in the calculation of the purchase option price.

> \* \* \*

> Shurgard would not have agreed to enter into the Lease Agreement if it had known that the calculation of the purchase option price in Section 2.4 of the Lease Agreement failed to require the use of annualized . . . [net-operating income] as the parties had agreed, and Shurgard would never have agreed to sell the Property to Lipton at a price that in effect reflects only half of its true value.

The district court specifically found that the complaint sufficiently stated a claim in equity that the enforcement of the contract, under principles of equity, would be unconscionable. We cannot say that the district court abused its discretion in doing so.

Finally, we disagree with the argument that Lipton was prejudiced by the substantial change in his position after entering into the lease agreement. The district court noted that most of the funds expended by Lipton occurred after Shurgard filed suit, not before. Moreover, while Lipton did not specify the expenditures, the district court found that they were spent on all three properties, not just the property located on Olive Boulevard. While Lipton hired a manager to run the Olive Boulevard property, that same manager ran the other properties under three separate agreements. Lipton produced no evidence that it hired this manager contingent upon Lipton being able to exercise its purchase option. Lipton does not dispute these findings of fact on appeal. The district court did not abuse its discretion in balancing the equities in favor of Shurgard.

For the reasons stated above, the judgment of the district court is affirmed.

_____