**MASSMAN CONSTRUCTION CO.,**
Respondent,

v.

**KANSAS CITY, Missouri, Appellant.**

No. 56394.

Supreme Court of Missouri,
Division No. 2.

Nov. 13, 1972.

Motion for Rehearing or Transfer to Court
En Banc Denied Dec. 11, 1972.

Aaron A. Wilson, City Counselor, Charles A. Lewis, Robert A. Dakopolos, Assoc. City Counselors, Kansas City, for appellant.

STOCKARD, Commissioner.

Kansas City, Missouri, (hereafter referred to as "Kansas City" or the "City") entered into a contract with Massman Construction Company (hereafter referred to as "Massman") for the remodeling of the Twelfth Street viaduct. After the completion of the work, Massman brought suit against Kansas City in five counts. In Count I Massman alleged a breach of the contract by Kansas City; Count II was based on an alleged willful misrepresentation in the bid plans and specifications; Count III was dismissed before trial; by Count IV Massman sought the recovery of an amount of the contract price withheld by Kansas City; and Count V pertained to an alleged oral agreement by which Kansas City was to reimburse Massman for the settlement of another lawsuit. Kansas City filed a counterclaim for liquidated damages based on the alleged failure of Massman to complete the work within the specified time.

The trial court entered judgment (a) in favor of Massman on Count I in the amount of $536,070 with interest thereon from April 20, 1966 to date of the judgment; (b) in favor of Massman on Count II in the same amount, but specifying that said judgment was in the alternative to the judgment on Count I and not in addition thereto; (c) in favor of Massman on Count IV in the amount of $10,669.01 with interest from January 1, 1967, to date of judgment; (3) in favor of Kansas City on Count V; and (e) in favor of Massman on the counterclaim. Kansas City only has appealed, and by its points in its brief it has limited the issues on appeal to those arising out of the judgment entered on Counts I and II and the counterclaim.

Miller & O'Laughlin, R. W. Miller, George T. O'Laughlin, Kansas City, for respondent.

Massman, as respondent, filed a motion to dismiss this appeal for failure of Kansas City, as appellant, to comply with the re-

quirements of Civil Rule 83.05(c) and (e) pertaining to the statement in an appellant's brief of facts and points relied on. The motion is not without considerable merit. However, in a liberal exercise of discretion the motion is overruled.

The transcript in this case is voluminous; consisting of more than 2,700 pages and 334 exhibits. The evidence will be related only to the minimum extent necessary to set forth understandingly the issues on appeal.

The contract was for extensive repairs to the Twelfth Street viaduct, a two deck structure, the basic construction of which was concrete with reinforcing steel. In 1964 the City employed the engineering firm of Howard, Needles, Tammen and Bergendorf (hereafter referred to as "Howard Needles") to make a study of its physical condition so the City could determine whether the viaduct should be replaced or rehabilitated. The City elected to rehabilitate the viaduct, and it entered into a contract with Howard Needles to design and prepare the plans and specifications for the work. The ordinance approving the contract provided that the plans and specifications should be in "general compliance" with the report of the study, and it also provided that Howard Needles should "make all additional field surveys and physical checks of the existing structure as necessary," and also to "prepare any supplemental design plans made necessary by conditions uncovered in the reconstruction operation."

The plans and specifications, as prepared by Howard Needles, were provided to prospective bidders on January 15, 1965, and the bids were received on February 5, 1965. A contract between the City and Massman was entered into in which it was expressly provided that the plans and specifications were incorporated as a part thereof.

Appellant contends in its brief that (a) there "was no substantive, competent, probative, admissible evidence adduced to es-tablish and prove that [Massman] performed 'extra work' outside the nature and scope of the contract provisions," (b) Massman's "'lump sum' bid of $418,000 for the removal of all deteriorated and unsound concrete bars [its] claims for removal expenses incurred in addition to or in excess of this bid amount and therefore [Massman] failed to make a submissible, prima facie case of [the City's] breach of contract for failing to compensate [Massman] over and above the $418,000 lump sum contract price for all removals," and (c) there was no evidence of a written contract between the City and Massman for "extra work" not included "in contract Ord. No. 30915," and therefore the City was not liable by reason of constitutional and statutory provisions requiring contracts with Kansas City to be in writing.

We shall first mention that this is a case tried before the court without a jury, and therefore the issue of "a submissible prima facie case" is not before us. Also we have some difficulty in determining from appellant's brief the factual issues pertaining to the work done which constitute the basis for the judgment in favor of Massman on Count I. In its brief Massman has broken down the specific claims under Count I into eleven categories. The City has not filed a reply brief and has not challenged the factual basis therein set forth. In our statement of the basis for the judgment on Count I we shall follow substantially the facts set forth in Massman's brief, but supplemented when appropriate with additional facts.

A. Upper Deck Cross Girder Tops. This is the largest claim in Count I. The roadway on the viaduct was of concrete with reinforcing steel and was covered with asphalt. The deck was supported by cross girders approximately 6½ feet apart which were tied into and supported by longitudinal girders, which in turn were supported by columns. The bid plans called for the removal of the old deck between the cross girders, and that part of the deck which rested on top of the cross girders

was shown to be of sound concrete and not to be removed, except that certain designated cross girders were to be completely removed and rebuilt. The design for the new deck called for the new layer of concrete to rest on the six inches of concrete to be left on the unremoved cross girders, thus resulting in the top of the new deck being approximately six inches higher than the top of the old deck. The only work called for on the top of the unremoved cross girders was an operation known as "bush hammering," which roughened the surface to cause a better bond between the new concrete and the top of the old deck. When Massman removed the deck between the cross girders it was discovered that the concrete on the cross girders was so highly deteriorated that the work called for by the plans could not be performed on any cross girder in the upper deck. The City's engineers did not prepare a new set of plans pertaining to these newly discovered conditions. Instead, they ordered Massman to use 15-pound chipping hammers to chip off the deteriorated concrete on the top of the cross girders. Massman protested, and it also requested extensions of time for completing the project made necessary by this extra work. These requests were denied. However, the City acknowledged that the work was done, and it recognized that Massman should be paid, but only for the amount of $19,100 based on the unit price for the additional amount of concrete that was required. Massman contends it was entitled to the sum of $505,153 for this work.

B. Columns and Piers. The plans and specifications provided that certain columns were to be removed to designated elevations and replaced. In the course of the work, it was discovered that the deterioration of the concrete required that a number of columns had to be removed below and beyond the elevations shown on the plans. Additional plans and specifications were not prepared by the City's engineers, but Massman was required to perform the work to the extent determined by the engineers as the removal of concrete

progressed. There is no dispute that work beyond the elevations shown on the plans was performed, and there is no dispute as to the quantity of the additional work. Massman contends it was entitled to more than $12,000 for this work.

C. Methods of Doing Work. Pursuant to the contract, Massman had the right to perform the work by such methods it selected. Massman contended in Count I that it was required by the City's engineers to use certain methods of removing deteriorated concrete which increased substantially the cost. However, this additional cost was included in the computation of the two previous claims designated A and B. Since, for reasons subsequently set forth, we affirm the judgment as to those claims, we need not examine further this claim.

D. Changes—Bid Plans to Construction Plans. Massman's bid was based on the work to be done as shown on the bid plans and specifications. After the contract was executed, the City issued to Massman a different set of plans called "Construction Plans" which contained over 600 changes, most of which were minor but some of which were substantial and resulted in an increase in cost claimed by Massman to be $25,045.47.

E. Extra Cantilever Brackets. The plans called for the removal and replacement of nine cantilever brackets on the upper deck. During the construction the City's engineers required Massman to remove and replace an additional 57 cantilever brackets which were not designated on the bid or construction plans. Massman contends the cost of removing and replacing these extra cantilever brackets was $21,664.44. Although the City agreed that this was extra work, it paid Massman only on a unit price for the volume of concrete poured for the additional brackets.

F. Extra Forming—Deck and Cross Girders. The plans and specifications provided for a small area to be formed above the top of the existing girders to bring

them in conformity with the bottom of the new deck. However, the chipping of deteriorated concrete resulted in the necessity of replacing the chipped out portions with poured concrete. This required the forming of the sides of each cross girder. Massman contends that the additional cost was $93,946.

G. Acceleration and Time Extensions. The work provided for in the contract was to have been performed in 420 calendar days, but it was provided if the City or any of its agents caused a delay in the work, the contractor should be given additional days for the completion. Massman made numerous claims for time extensions, which were not granted, and at the time of trial the Director of Public Works had such claims "under consideration." Because the rulings on the requests were not timely made, Massman accelerated the work through the use of more men, overtime work, and the use of additional equipment, all at an increased cost. Massman contends the increased costs were $204,567. From the general wording of the points relied on pertaining to the judgment on Count I, and the references to provisions of the contract, it appears that the City has not made a direct challenge to this claim, unless it can be said to be presented in its contention in support of its counterclaim, subsequently discussed.

H. Shotcrete Disallowance. The shotcreting was done under a subcontract between Massman and the Gunite Company. There were 8,830 sacks of shotcrete used and only 7,845 were paid for by the City. Massman contends it is entitled to $25,470 for the extra shotcrete. We find nothing in appellant's points which directly challenges this amount.

I. Unit 1 Slab. The contract called for the removal of the north half of the deck slab at one of the designated units. Because of the condition discovered during the work the balance of the old slab was removed by Massman at the direction of the City, and the cost of that work was $724.99.

J. Electrical Manhole. The plans called for the installation of a concrete pipe between new catch basins and an existing manhole, designated as a storm sewer manhole. However, during the progress of the work it was discovered that what was designated as a storm sewer manhole was an electrical manhole owned by Kansas City Power and Light Company. The engineers revised the plans and the work was performed, but the City paid for the work on the unit price for pipe. The cost to Massman was $4,108.45.

K. Sums Withheld. The Court allowed $10,600 for sums withheld on force account work in connection with downspouts. There is no complaint concerning this in the City's brief.

The City states its position in the argument portion of its brief "that the chipping work which Massman did was required by the contract and therefore not 'extra work' which entitled Massman to any compensation other than that which it has already received, i. e. $418,000 pursuant to Massman's lump sum bid for all removals." We note here that some of the claims under Count I were for work other than removal of deteriorated concrete, and no specific challenge is directed to those claims. It appears, however, that all of these other claims resulted from conditions discovered as the result of the removal of deteriorated concrete. The City relies on certain provisions of the contract, as set forth in the Specifications (except when stated to be otherwise) which, with emphasis added, are as follows:

Section 2–01. Removal of Present Construction—General. The contractor shall remove portions of the existing viaduct * * * to the extent *shown on the plans or described herein.*

The roadway decks * * * shall be removed to the limits shown *on the plans.* Care shall be taken to limit the depth of removal in the tops of the girders and beams to not more than 1 inch into sound concrete. * * *.

Various columns, girders, floorbeams, and cantilevers *as designated by the plans* shall be removed in part or their entirety. * * * The extent of removal may be modified by the Engineer as the work progresses. The Contractor agrees to accept a greater or lesser amount of removal work from that shown on the plans and to perform this work at the price bid for 'Removals.' Changes in the amount of removal work, if any, will be made primarily when initial removal reveals an unanticipated condition of the existing structure.

Section 2.04. Repair of Deteriorated Concrete—General.

\*     \*     \*     \*     \*     \*

To correct the deterioriated conditions as indicated· by visual inspection and as uncovered during progress of the repair work, repair operations will include removal of all deteriorated concrete, cutting out all corroded or misplaced reinforcing steel, cleaning of all surfaces to be bonded with new concrete, replacement of reinforcing by welding to existing bars and *as otherwise shown on the plans*, application of shotcrete to certain areas and pouring of concrete in forms.

Section 2.06. Bonding New Concrete to Old.

\*     \*     \*     \*     \*     \*

The surface of the old concrete to which new concrete is to be bonded shall be cleaned with hammers, wire brushes and the like so that all foreign material, loose and unsound concrete is removed and only sound concrete remains. * * *.

Section 1.05. Estimated Quantities.

The estimated quantities are listed in the Proposal. Such quantities are estimates only for the purpose of comparing bids. The Contractor will be required to complete the work specified herein in *accordance with the contract plans* whether quantities are greater or less than those indicated in the Proposal.

Part D-1. Standard General Provisions entitled

"Scope of Work."

The Contractor shall furnish all labor, material, equipment, construction plant, and supervision necessary to construct and complete the improvements *set forth in the plans and specifications.* * * * A more detailed description of the scope of work will be given in the construction specifications but such description shall not limit the responsibility of the Contractor to fully complete this contract in accordance with *the full intent of all contract documents.*

Section 13.01. Measurement and Payment. General.

Item No. 1—Removals.

1.01 Scope of Work. The work provided for in these specifications and accompanying plans consists of furnishing all plant, labor, material and equipment required to accomplish the remodeling of the 12th Street Viaduct. The work includes, but is not necessarily limited to, the following:

1. Removal and disposal of all or portions of various concrete slabs, handrails, side walks, girders, columns and other members *as designated on the plans.*

\*     \*     \*     \*     \*     \*

4. Repair of spalled and deteriorated areas on all concrete with shotcrete or poured concrete.

Payment for removal and disposal of all portions of the existing structure *as shown on the plans and as required in the specifications* will be made at the contract lump sum price for bid for "Removals." The amount and extent of removal of portions of the existing viaduct *as indicated by the plans* is approximate only. The actual amount of removals will be determined at the time the work is being performed. Payment for this item of work shall include complete and full compensation for * * * bush-

hammer finish of concrete surfaces *as required by the plans.*

\*　\*　\*　\*　\*　\*

The Contractor agrees that the lump sum price bid for this item [removals] shall be full payment for the work performed regardless of any increase or decrease in the amount of work from that indicated on the plans.

Another provision of the contract, Section 1-04 of the Specifications, which the City does not refer to in its brief, is as follows:

For the repair work involved, the plans are indicative only of the type of repairs contemplated. The extent of the work which will be necessary to remove and restore all deteriorated concrete parts cannot be determined by visual inspection. The accompanying plans show only repairs considered necessary based on inspections which have been made. As the work of removing deteriorated concrete progresses, conditions may be disclosed wherein the concrete cannot be restored *by methods shown by the plans.* In such cases, *additional plans will be prepared by the Director of Public Works and the Contractor shall proceed with all work as directed.* If unit price bids are not applicable, payment will be made on the basis of extra work.

The trial court found that the various provisions of the contract upon which the City principally relies are not "clear and unequivocal" and do not prevent Massman from recovering for the "extra work" performed by it, and it further found that the removal of deteriorated concrete in addition to that shown on the plans was "extra work" within the meaning of the contract. The trial court further found that the concrete on the tops of the upper deck cross girders was not sufficiently sound to permit the treatment prescribed by the plans; that the City refused Massman the right to remove the deteriorated concrete by the means it wanted to use; that additional forming was required by reason of the additional concrete that had to be removed; that substantial changes from the bid plans were called for by the construction plans at substantial cost to Massman; and that the City required Massman to perform extra work on designated columns and piers, in removing and replacing 57 cantilever brackets, and in relocating a storm sewer pipe from a terminus at an electrical manhole.

■　When we consider the provisions of the contract so as to give effect to all of its provisions, McIntyre v. McIntyre, Mo., 377 S.W.2d 421, we conclude that the scope of the work to be done in the removal of deteriorated concrete for which the lump sum bid was to constitute the total compensation was that provided for in the plans and specifications, with reasonable tolerances. The emphasized portions of the contract provisions relied on by the City make this reasonably clear. By the terms of the contract, it is specifically recognized that the amount of work to be done could not accurately be determined from a visual inspection or from the inspections that had been made. Apparently for that reason Section 1–04, quoted above, was incorporated into the contract. This section results in the so-called "extra work" being done pursuant to the contract, as distinguished from work done outside of the scope and coverage of the contract.

It may be argued, as the City does, that the provisions of Section 2.01 which provides that "The Contractor agrees to accept a greater or lesser amount of removal work from that shown on the plans and to perform this work at the price bid for 'Removals'" required Massman to perform all the removal work it did at the price bid. However, to so construe Section 2.01 results in Section 1.04 being entirely meaningless, a construction to be avoided if possible. We cannot assume that Section 1.04 was placed in the contract for no reason. This contract was prepared by the City. Its language was not the result of negotiations between the parties, and in such a

circumstance it is reasonable and proper to construe its provisions against the party who drew it, McIntyre v. McIntyre, Mo., 377 S.W.2d 421, and to reconcile these two provisions so as to give a meaning and purpose to each. State Mut. Life Assur. Co. of Worcester, Mass. v. Dischinger, Mo., 263 S.W.2d 394.

■ The evidence of Massman clearly authorized a finding and the trial court found that the extensive deterioration of concrete discovered as the work progressed resulted in it being impossible to complete the restoration of the viaduct in the manner provided by the plans. This clearly placed the duty on the City to prepare additional plans and to pay for the work called for by the additional plans. We conclude that Count I was an action by Massman *on the contract* for damages for a breach thereof by the City, and the judgment of the trial court reflects the additional compensation it determined Massman should have received for that work done under the contract. For this reason we need not discuss in detail the contentions of the City that Massman cannot recover on Count I because (a) there was no written contract between the City and Massman for "extra work" not included in "contract Ord. No. 30915"; and (b) Massman failed to submit documented and detailed proposals to the Director of Public Works before commencing "extra work."

The second point in the City's brief pertains to Count II upon which judgment was entered by the trial court in the same amount as the judgment on Count I, but which was expressly stated to be in the alternative and not in addition to the judgment on Count I. By reason of our ruling on the judgment entered on Count I, we need not rule on the contentions of the City concerning Count II.

By its third point the City contends that the trial court erred in failing to render judgment for it on its counterclaim for liquidated damages in the amount of $590,000.

The contract provided that the work on the upper deck was to have been substantially completed within 230 calendar days from March 1, 1965, and that all work was to be substantially completed within 320 calendar days. The contract provided for "liquidated damages" in the amount of $3,000 per day and $2,000 per day for each day the upper deck and all the work respectively were not substantially completed.

■ In its brief the City states that the "testimony of Rupert Smith and [Massman's] admissions" in a letter "established and proved that Massman was 64 calendar days tardy in substantially completing work on the upper deck." Neither the testimony of Rupert Smith, nor its substance, is set out in the City's brief, nor is there a reference where in the 2,700 page transcript the testimony referred to may be found. In our examination of the transcript we find that Massman offered in evidence portions of a deposition of Mr. Rupert M. Smith, Jr., who was resident engineer for Howard Needles on the Twelfth Street Bridge project. Pertaining to time of completion of the upper deck we find the following question and answer: "Question: At some point while you were on the job did Massman accelerate to complete the work on the upper deck? Answer: They completed the work on the upper deck by the completion date, yes, sir." We also find that the City subsequently called Mr. Smith as a witness, and his testimony covers 245 pages in the transcript. A portion of his testimony on direct examination is as follows:

Q. Now as of October 16th, what amount of upper deck repair work was to have been completed in 1965, October 16th, 1965?

A. The upper deck at that time was scheduled for substantial completion. Of course you would only have—you only have figures here for the first of each month.

Q. So as of November, approximately November 15th, had the upper deck repaid work been 100% complete?

A. Yes.

We do not find that he testified as to the progress on the work on the upper deck on October 1 or on October 16, 1965. We also find that Mr. Marion J. Kopetz, project manager of Howard Needles for the 12th Street Viaduct project, testified that on April 4, 1968, in reply to a request for information for the use of Mr. Myron D. Calkins, Director of Public Works for the City, he gave him certain information including the following:

| | |
|---|---|
| Upper deck scheduled completion | 10–16–65 |
| Upper deck—completed | 10–15–65. |

The trial court's finding that the City was not entitled to liquidated damages for a delay in the completion of the work on the upper deck is supported by the evidence.

The City asserts in its brief that "The lower deck was not open to traffic until August 12, 1966, 199 days after the required completion date after having been given credit for 10 calendar days time extension * * *." In its brief Massman asserts that it "was entitled to time extensions under the applicable contract provisions far in excess of the number of calendar days (199) by which [the City] claims that [Massman] was tardy in substantially completing all work on the project." The trial court found that the extra work referred to in six separate requests for extensions of contract time, one of which was designated "17(a) through 17(n)" and apparently including fourteen requests, "required extensions of contract time for the performance thereof." The total amount of time that should have been granted pursuant to those requests is not set forth in the court's findings or in the briefs. The trial court also expressly found that Massman was delayed in its performance of the work because of acts of the City, see Gillioz v. State Highway Commission, 348 Mo. 211, 153 S.W.2d 18, and also that the City directed Massman to perform extra work on the lower deck after January 15, 1966, the contract date for completion, "and thereby waive[d] its claim for liqui-

dated damages on the lower deck." The trial court also expressly found that the City was not entitled to "liquidated damages in the amount of $192,000 plus $398,000, or a total of $590,000."

■ In its brief the City makes no challenge to the above findings of the trial court, and it has filed no reply brief in opposition to the factual assertions by Massman. The burden is upon the City, as appellant, to demonstrate why the judgment of the trial court on the counterclaim is incorrect, Schlanger v. Simon, Mo., 339 S. W.2d 825, 831; and without a successful challenge to the trial court's findings, the City is not entitled to a judgment on its counterclaim. Under these circumstances it is not proper for this court to become an advocate for the appellant and search for a basis to challenge these findings. The trial court's judgment on the counterclaim is to be affirmed.

■ The City, as a part of its first point, asserts that a judgment against it in excess of $2,357.82 is illegal and void because that is the total unencumbered balance remaining of the money specifically appropriated for the total payment under the contract. On this appeal we are not concerned with whether a judgment can be collected, but only with whether a judgment should be entered. See DiCarlo Constr. Co. v. State of Missouri, Mo., 485 S.W.2d 52.

■ Massman, as respondent, asserts that the evidence shows that it was entitled to $903,869.84 under Counts I and II instead of $536,070, the amount of the judgment. It contends that in this case, tried before the court without a jury, we review the record de novo, and citing Madget v. Jenkins, Mo., 461 S.W.2d 768, Massman contends that we have "the power and duty to substitute whatever judgment [we] think the trial court should have entered as the judgment below." Reliance is placed on the statement in the Madget case that "the issue on appeal in a court-tried case is the propriety of the court's decision on the whole record, the case being determined de

novo on appeal on the facts, with the appellate court having full authority to make its own findings of fact and order proper relief."

Massman did not appeal from the judgment entered on Count I or Count II. It is our opinion that the above quoted statement from the Madget case, and similar statements in other cases, means that the appellate court reviews the whole record and may enter such judgment as the trial court should have entered *within the issues presented on appeal.* Whether the *amount* of the judgment should have been greater than that entered is not an issue on this appeal.

The judgment is affirmed.

HOUSER, C., concurs.

PER CURIAM:

The foregoing opinion by STOCKARD, C., is adopted as the opinion of the Court.

HENLEY, Acting P. J., DONNELLY, J., and FINCH, C. J., concur.

MORGAN, P. J., not participating.