[Civ. No. 8120.   Third Dist.   June 23, 1952.]

OPDYKE & BUTLER (a Copartnership) et al., Respondents, v. BENJAMIN SILVER, Appellant.

Carl Kuchman for Appellant.

McAllister & Johnson for Respondents.

VAN DYKE, J.—Respondents, a copartnership, as plaintiffs, brought this action against appellant to recover an alleged balance due upon an oral contract.   They alleged that on March 15, 1950, they entered into a written contract with appellant to do certain construction work in the remodeling of a building.   They next alleged that on the same day and by mutual oral agreement the written contract was abandoned, and that the parties thereupon orally agreed upon the terms of a new contract; that they then adopted new plans and specifications to designate the work to be performed under the oral agreement and that respondents' compensation was to

be on the basis of cost plus 10 per cent. Further alleging that cost of the completed work, plus 10 per cent, amounted to $24,253.79 and that only $17,652.38 had been paid, they prayed judgment for the difference. Appellant answered, admitting that the written contract had been entered into and that the compensation thereunder had been cost of the completed work, plus 10 per cent, but appellant alleged that the written contract provided for a maximum limit as to cost of $15,900. He denied that this contract had been abandoned and alleged that all the work that had been done by respondents had been done pursuant to it and under plans and specifications made a part of it. The controversy between the parties centered around this matter of the alleged abandonment of the written agreement and the substitution of an oral contract in lieu thereof. The trial court found that on March 15, 1950, the parties had entered into a written contract and that under it respondents were to perform certain construction work for appellant at cost plus 10 per cent, with total cost not to exceed $15,900; that on the same day and by mutual oral agreement the written contract was abandoned, new plans and specifications were prepared, orders for new and different work were given to respondents and that the parties orally agreed upon a new contract whereby the work was to be done in conformity with the new plans and specifications and the new orders at cost plus 10 per cent, without a maximum limit; that the work had been done, and that the difference between the amount paid and the amount earned amounted to $6,-600.52. Judgment accordingly followed.

It is not disputed that on the date alleged a written contract was entered into; that plans and specifications as drawn by an architect were made a part of it and that the contract so executed was full and complete as a construction contract. It contained the usual provisions for supervision of the work by the architect as the work progressed, for the making of progress payments based upon statements for labor and materials incorporated in the work, furnished by the contractor from time to time and approved by the architect. Appellant was given the contractual right to order changes in the work, the contract price to be adjusted accordingly but it was stipulated that all such orders and adjustments should be in writing and that claims for extra cost must be made in writing before executing the work involved. It is appellant's contention that although numerous and material changes were made in the work to be done by respondents during the course

of construction, beginning quite early in the history of the work, yet that these changes were made under the written contract; that though they may have justified claims for extra cost neither these changes nor anything else occurring worked an abandonment of the written contract and the mutual adoption of an oral contract. Appellant, therefore, argues that respondents' recovery would have to be in accordance with the written contract limited by the maximum price save for allowable extras, less allowable deductions, where changes worked a saving. Appellant argues further that, there being no support in the record for the court's finding of abandonment of the written agreement, it results that the proof made by respondents was wholly inadequate to support findings or judgment, since it consisted of a running account of work done and material installed by respondents and their subcontractors without consideration of the maximum price. On the contrary, respondents contend, in line with the findings and judgment of the trial court, that the written contract was abandoned, that the oral contract substituted therefor contained no maximum nor other contract price save cost of labor and material plus 10 per cent and that, therefore, it was proper to prove the amount earned and unpaid by the introduction of their ledger account of such cost of labor and material.

Though the trial court found that the written contract had been abandoned on the very day it was signed, we note that respondent Opdyke, while he testified in respondents' behalf as to the abandonment of the written, and the adoption of the oral, contract, with different plans and specifications governing work to be done, yet he did not claim, though he appears to have been the managing agent of the partnership in respect of the appellant's work, that there had been an abandonment until May or June, after work had been under way for a considerable time. And no testimony was given that the parties ever expressly agreed to abandon the written contract or to adopt the alleged oral agreement. Opdyke simply assumed, according to his testimony, that such abandonment and adoption had been worked by reason of the constant changes, and the constant interference with the work, by appellant. He testified that he contended there came a time when the written contract no longer applied and they were no longer working under it and that this occurred upon a day when appellant, expressing dissatisfaction with the architect's services, told Opdyke that he (Opdyke) was as good an archi-

tect as the one the parties had agreed upon and for him to go ahead and run the job as he saw fit. He said "That contract [the written contract] was based upon the plans and specifications as they were originally drawn. There being numerous changes that developed that in my opinion made the contract, drawn as it was stated in the original agreement a cost-plus agreement." This culminating incident, in the opinion of respondent Opdyke, worked the abandonment of the written contract with its maximum price limitation and its provisions for extras, and amounted to the making of a new agreement, on a straight cost plus basis. He could fix no definite date for this happening, but said it was about the time when they had started the plastering and was either in May or June of 1950, some two months after the written contract was executed and some six weeks after the building permit was taken out and the first labor costs incurred. In addition to the foregoing and as pertinent to the question of when, if at any time, the abandonment of the old and the adoption of a new contract occurred, Opdyke testified that he submitted bills regularly to appellant which were approved by the architect and paid. He identified bills dated May 2d, June 2d, July 13th and August 1st of 1950. The bill of July 13th resulted in a "Certificate of Payment" issued by the architect for the amount called for in the sum of $8,767.63. The certificate referred to the "Original Amount of Contract" in the sum of $15,900 and to "Extras" in the sum of $305.51, which, according to the certificate, raised the contract price to $16,205.51. The architect stated on the certificate this total sum did not include "extra changes by the owner." The certificate certified that there had been theretofore approved by the architect the sum of $6,032.70, which, when added to the face of the certificate, made a certified total of $14,800.33, leaving a balance on the original contract, plus allowed extras, and without extra changes by the owner of $1,405.18. Opdyke acknowledged over his signature upon the face of the certificate that he had received the payment called for by the certificate. At this point we may here say that, in view of the foregoing evidence, we think it clear the trial court's finding that the written contract had been abandoned on the day it was made, and that on that day an oral contract in lieu thereof had been entered into is without support by, and is contrary to, the evidence.

But we think also that the precise or even the approximate day the written contract was abandoned and the oral one

adopted, if such occurrences took place, is not material. If, taking the evidence most favorably to respondents, there be anything from which it may be inferred that at any time during the course of construction there was an abandonment of the written contract, either actual or implied, and a substitution therefor of an oral contract on a straight cost plus basis, then the judgment must be affirmed, for there is on the record no room for dispute that the actual cost was as found by the trial court. We will examine the record further to see whether the judgment may be sustained on such a theory.

Respondents do not rely upon any evidence of express abandonment; but they say that abandonment may be implied from the acts of the parties. They quote from *O'Loughlin* v. *Poli*, 82 Conn. 427 [74 A. 763, 765], where the court said:

". . . The parties to a written contract of the character of the one under review are as free to alter it after it has been made as they were to make it, and all attempts on their part by its terms to tie up their freedom of dealing with each other will be futile. . . . To this end parol agreements will be as effective as written ones. . . . And implied agreements satisfactorily established will have all the force of express ones."

They quote further from the opinion of Justice Holmes written in *Bartlett* v. *Stanchfield*, 148 Mass. 394 [19 N.E. 549, 2 L.R.A. 625], where that noted jurist said:

". . . Attempts of parties to tie up by contract their freedom of dealing with each other are futile. The contract is a fact to be taken into account in interpreting the subsequent conduct of the plaintiff and defendant, no doubt. But it cannot be assumed, as matter of law, that the contract governed all that was done until it was renounced in so many words, because the parties had a right to remove it in any way, and by any mode of expression, they saw fit. They could substitute a new oral contract by conduct and intimation, as well as by express words." (See, also, 66 A.L.R. 649, and *Bavin & Burch Co.* v. *Bard*, 81 Cal.App. 722 [255 P. 200], and cases cited.)

Respondents say they made out their case in accordance with the foregoing statements of the law and they recite the following testimony in support of that contention. From the very start of the work appellant constantly changed his mind concerning the construction, and the completed alterations differ markedly from the blueprints and specifications attached to the original contract. Appellant himself admitted the fol-

lowing changes made with his knowledge and at his request:

1. The stairway to the second floor was removed after it had been constructed, and a new stairway built with different risers.

2. The stairway from the main floor to the basement was changed.

3. A new and different counter was built on the first floor.

4. A stair rail was added to the basement stair.

5. There were two change orders in the basement, and then the basement was reconstructed according to the first change order, with changes therein requested by appellant.

6. A curved watchmaker's bench was installed instead of a straight one, and at least 15 new drawers constructed.

7. A change in the optometrist's refraction room required the removal and rerouting of pipes rather than furring in the pipes.

8. Plywood was substituted for plasterboard in the construction of basement partitions.

9. Plastering was changed due to the change in lighting systems.

10. The entire lighting system was changed to provide recessed lighting rather than dropped fluorescent lighting.

11. This required the lowering of the ceiling to accommodate the lighting system.

12. There were additional lights added to the system.

13. There were additional electric plugs placed wherever appellant or members of his staff requested them.

14. A pipe was torn out of the wall and replaced because of a leak.

15. Office furniture was planed down and repainted.

16. The safe was to fit under a stairway. However, the space was filled with drawers, and the safe was covered with hardwood on three sides.

17. The safe was fitted with drawers and shelves for the storing of jewelry.

18. A new counter was placed in the dentist's office upstairs.

19. Wall cases were moved out from the wall, and this involved plastering behind the cases.

20. The partition for the optometrist's room had to be removed and changed at the request of appellant.

We think there can be no doubt that these numerous changes, some minor it is true but many of which must have interrupted the orderly progress of the work, materially increased the contractor's cost and forced the doing of the work under

disadvantageous circumstances. These changes began even before the work was started, and evinced a high degree of uncertainty on the part of appellant as to what he wanted done. They show the early adoption and consistent use of a policy of demanding changes and even reconstruction after portions of the work were completed. This goes far toward supporting the soundness of the trial court's conclusion that the original contract was in fact abandoned. There was other evidence that should be mentioned, tending to the same conclusion. Although the written contract, as noted, provided that all change orders should be approved by the architect, should be in writing, and the contract price should be adjusted accordingly before the work was done, yet the parties consistently ignored this requirement in material part. Although at the very beginning two change orders were made in writing, no adjustment in price was made and no further written orders were used. Opdyke testified that there was a pretty consistent running fire of change and suggested change on the part of appellant, with nothing said as to price except appellant's saying ''That won't cost very much will it?'' Apparently no answer was expected; certainly none was required. The electrical installation was radically changed and the cost greatly increased. For the most part no serious attempt was made between the parties to follow the contract requirement of separately charging for extras. Some extras were charged it was true, as has been stated, and for a while an attempt was made to carry the work along on the basis of contract work and extra work, but long before the work was completed this system seems to have been departed from. And even in the architect's certificate of July 14th, hereinbefore discussed, there was an express reservation, which the architect said the respondents insisted upon, that the net amount of extras therein stated did ''not include extra changes by the owner.'' It appears that appellant paid the certified amount without asking any explanation of that reservation. Furthermore appellant paid sums substantially over the maximum limit stated in the written contract without asking justification as extras. The original plans call for seven fluorescent light fixtures to be added without additional wiring, but when the electrician began work conditions showed up in the old walls necessitating radical changes in order to comply with applicable building laws and it appears that to a great extent appellant directed extensive electrical installations be made without so much as consulting respondents. Opdyke so testified,

adding that even at the time of the testimony he did not know what wiring was done, but could see, after the electrician started, that he was not following plans and specifications as to wiring. He said further that he discussed the matter with appellant who said that the electrician had gotten along with him so well on a residence he had wired for appellant that he would handle the electrician, and Opdyke was to leave the wiring up to appellant. By projecting himself into the daily work of performance and by himself joining in ignoring the stipulation for written change orders and price agreement for extras before the work was done appellant participated in, if he did not compel, the destruction of the device intended to make and to keep clear the separation of extras from contract work, which device was badly needed to make the maximum price agreement workable. The provision that appellant could require changes was not intended to permit him to destroy the identity of the contract work. Without going further into the details of evidence, it does appear that from a time even before work had started and until the completion of the job, the parties had in many respects disregarded the terms of the written contract; that appellant had arrogated to himself the right to make sweeping changes without arriving at cost and, in short, that he completely took over the minute directing of work to be done, whether it complied with the plans and specifications attached to the written agreement or not. One result was that the cost to the contractor must have been greatly increased so as to make it unfair that, having dictated what was to be done without bothering to agree upon the price, appellant should now be permitted to plead the maximum price provision which he himself had made inapplicable and unjust. While we do not think the specific holding of the trial court that the written contract was abandoned on the date of its making can be sustained, we think that the trial court was well justified in determining that, by the course of conduct which the parties adopted, they abandoned the price limitation and proceeded upon a straight cost plus basis. That is all that is necessary to warrant the upholding of the judgment.

The judgment is affirmed.

Adams, P. J., and Schottky, J. pro tem., concurred.