**Roy J. PALLARDY and Seth Evans, Plaintiffs-Appellants,**

v.

**LINK'S LANDING, INC., Defendant-Respondent.**

**No. 9761.**

Missouri Court of Appeals, Springfield District.

April 22, 1976.

John E. Burruss, Jr., Hendren & Andrae, Jefferson City, for plaintiffs-appellants.

Charles E. McElyea, Ronald K. Carpenter, Phillips & McElyea Corp., Camdenton, for defendant-respondent.

Before STONE, P. J., and HOGAN and FLANIGAN, JJ.

HOGAN, Judge.

Plaintiffs brought this action claiming that the sum of $11,989.30 remained due them under the terms of a contract pursuant to which plaintiffs performed architectural services for the defendant. Upon trial to the court plaintiffs had judgment in the amount of $2,192.50, plus interest in the sum of $401.15. Plaintiffs appeal, contending for various reasons that the award of damages was inadequate.

In briefest sketch and outline, the background facts are that on June 30, 1969, James Muff, then vice president of Link's Landing, Inc., contacted plaintiff Roy Pallardy, an architect, concerning proposed improvement and expansion of defendant's docking and parking facilities. The improvements included substantial excavation, the construction of retaining walls, the addition of a parking structure and paving. Pallardy proceeded to prepare estimates and a preliminary sketch of the proposed site improvements, and submitted these to Muff in August 1969; there was considerable disagreement about the possible cost of the project. Pallardy originally estimated $363,140 as the total cost of the improvements; Muff, using estimates obtained from local (Camden County) contractors, insisted that the project could be completed for $259,200. On trial Muff indicated that a $250,000 maximum was a prerequisite to his undertaking the venture. Plaintiffs denied that any limit was placed upon construction costs, but admit they were aware Muff undertook the project in the belief it could be completed for approximately $259,000.

On August 15, 1969, Muff signed a "letter of intent" which Pallardy had written and sent forward for approval. As material here, the letter reads (emphasis is ours):

"First, the fee for the entire project will be 6% of the cost of project, for full services. This includes preliminary design and estimates of cost, production of construction drawings and specification [sic], obtaining of bids from Contractors if desired, and preparation of construction contracts, and finally, casual supervision of construction . . . checking contractor's monthly estimates for payment . . . and final inspection of the project for Owner's acceptance. The fee is divided as follows: On approval of preliminary design, with instructions from the Owner to proceed with construction drawings, 25% of the fee is due. Preparation of construction drawings and specifications shall comprise 50% of the fee, this amount payable monthly in proportion to completion of the work and due fully at the time of requesting bids or granting contracts. The final 25% of the fee is payable monthly during the construction phase, in proportion to contractor's completion of the project. In the event the services of the Architect are no longer desired by the Owner during the construction phase, the basic fee shall be reduced by 25%, to 4½% of the project cost. In this event, the Architect will require a release of responsibility for the project, inasmuch as he will no longer have control of the construction. Fee payments will be based on the estimated cost until such time as contracts are signed and project cost is actually determined, and shall be adjusted to actual contract amounts.

\*　　\*　　\*　　\*　　\*　　\*

"We will break our cost estimates down by various parts of the work, *so that you may decide to do all or part of the work, or plan it in stages.* We will base the parking structure cost on one or several multiples of a basic unit."

Muff signed this letter, and on August 24, 1969, requested Pallardy to prepare contracts for the excavation. On September 18 Muff instructed plaintiffs to complete the preliminary drawings, "bill him for the drawings and hold up." The project was

held in abeyance until April 1970 when Muff requested an artist's rendering for use in obtaining a loan. The artist's rendering was supplied and Muff obtained a loan, $250,000 of which was set aside for the planned site improvements. In August 1970, after receiving preliminary designs, Muff instructed Pallardy to proceed with the project.

Controversy arose after the excavation work had been begun. On November 9 and 10 plaintiffs' designs and specifications for the retaining walls were taken to contractors for bids. The lowest bid obtained was $150,800; plaintiffs' estimate had been $50,-640, and defendant rejected plaintiffs' design. Depending on whose viewpoint one accepts, this disparity was a) caused by plaintiffs' failure to ascertain the condition of the subsoil and design the type of wall required, or was b) the result of Muff's desire to complete the project as quickly as possible, which required the plaintiffs ·to anticipate "the worst conditions for subsurface materials." One of the walls was redesigned and constructed at a total cost of $54,000. The other wall was not built.

By December 17 plaintiffs had completed drawings and specifications for the parking structure. These were mailed to a contractor, and computation of the amounts of rock and concrete required indicated that the parking structure would cost $191,000 as compared with plaintiffs' estimated $120,000. Muff complained to Pallardy, who suggested that bids be obtained before the design was changed. Muff said "to hell with that" and discharged Pallardy's firm. Thereafter plaintiffs requested payment of 1) full fees based on contract prices for the excavation and for construction of one retaining wall; 2) 75% of the fee for one retaining wall (designed but not constructed, based on the estimated cost); 3) 75% of the fee for the parking structure (designed but not constructed, based on the estimated cost); 4) 25% of the fee for paving (based on preliminary work and estimated cost); and 5) sundry expenses, altogether amounting to $15,736.80, with credit allowed for prior payments of $3,747.50. Muff declined to remit this amount and this action followed. After hearing evidence, the trial court made voluntary findings and entered judgment as follows:

"(1) [T]hat Plaintiffs and Defendants [sic] entered into a contract on August 15, 1969, whereby Plaintiffs agreed to provide architectural services for Defendant, and Defendant agreed to compensate Plaintiffs therefor pursuant to the terms of said contract; (2) that the terms of said contract, *inter alia*, vested Defendant with the right to do, as the project, 'part or all of the work' upon which Plaintiffs were to provide architectural services; (3) that Plaintiffs' compensation for the project, if it progressed beyond feasibility study phase, was to be six (6%) per cent of the cost of the project; (4) that the project . . . consisted of excavation of construction site and construction of one (1) retaining wall at cost of $45,000.00 and $54,000.00 respectively; (5) that the fee to which Plaintiffs are entitled for said project is $5,940.00; (6) that Plaintiffs have heretofore received payments applicable to said fee totaling $3,747.50; (7) that Defendant owes Plaintiffs a balance thereon in the amount of $2,192.50; (8) that Plaintiffs made demand upon Defendant for payment of sum owed for the aforesaid services on February 27, 1971.

"Judgment for Plaintiffs and against Defendant in the sum of $2,192.50 principal, together with $401.15 accrued interest thereon, for a total of $2,593.65. Costs taxed to Defendant."

In this court the parties have briefed and argued several specific assignments of error; their points are correlated with and based wholly upon their differing interpretations of the "letter of intent" and the trial court's findings. Plaintiffs insist there is nothing in the "contract" (the "letter of intent") which may be reasonably interpreted as limiting their compensation in the event their plans and specifications were not used. Plaintiffs speculate as to the meaning of the trial court's finding No. 2, suggesting that the trial court concluded either a) that if plaintiffs' designs were not

used, defendant was under no obligation to pay, or b) that the court concluded, as defendant suggests, that defendant imposed a maximum cost limit which the plaintiffs failed to observe. In either case, plaintiffs say, the trial court's conclusion is erroneous. Defendant rejoins by saying that finding No. 2 amounted to a finding that the contract was divisible, and plaintiffs were only entitled to compensation for those parts of the total project which were completed through the use of plaintiffs' designs. Alternatively, defendant maintains that a maximum construction cost was set for the project and plaintiffs failed to work within the limiting cost range. Both parties have cited authority in support of their respective positions; each urges that careful scrutiny of the remarkably diffuse record (which consists of the record testimony, the parties' trial briefs, and 38 loose exhibits, including 80 pages of technical engineering drawings) would disclose the soundness of his position.

The difficulty with the parties' approach in this court, particularly the plaintiffs' complaints, is that the findings they attack were made voluntarily without request by either party. Findings made without request are in the nature of voluntary statements by the court, are not reviewable, and present no question for review other than as a general finding. *Conley v. Crown Coach Co.,* 348 Mo. 1243, 1251, 159 S.W.2d 281, 285[8] (1942); *Swetnam v. U. S. By-Products Corp.,* 510 S.W.2d 829, 830[1] (Mo. App.1974). We might speculate about the trial court's findings, as the parties have, but we do not really know the precise basis for its decision, the judgment is presumptively correct, and the plaintiffs have the burden of demonstrating that the judgment is erroneous. *Massman Construction Co. v. Kansas City,* 487 S.W.2d 470, 478[6] (Mo. 1972); *Weston v. Great Central Ins. Co.,* 514 S.W.2d 17, 21[1–3] (Mo.App.1974).

We do not believe that burden has been met. Assuming, as the plaintiffs do, that the "letter of intent" constituted the parties' contract—a proposition we accept with

considerable reserve—it does not follow that plaintiffs are entitled to all the compensation they claim. Considerable effort has been expended by the parties in arguing the meaning or proper construction of the sentence (in the letter): "We will break our cost estimates down by various parts of the work, *so that you may decide to do all or part of the work . . . .*" Plaintiffs assert that this language has nothing whatever to do with, and in no way limits, defendant's obligation to pay them for their work. Defendant, couching its argument in terms of "severability", maintains this provision gives it the option to do as much or as little as it chooses, which in legal effect is an argument that the contract is "unilateral" and lacks mutuality of obligation. We think it is arguable that the quoted language, following as it does a description of the services plaintiffs proposed to perform, operates as a modification and pro tanto nullification of the duties and obligations spelled out in the first quoted paragraph of the letter. See 3 A. Corbin, Contracts § 547, at 176 (1960). If so, plaintiffs would be entitled to compensation for their services up to the time the defendant exercised its right to terminate the contract, and the quantum of performance would be a matter of fact. *Jensen v. Estate of McCall,* 426 S.W.2d 52, 57[7] (Mo.1968); *Roberts v. Harmount Tie and Lumber Co.,* 264 S.W. 448, 449[1] (Mo.App.1924). Without detailing all the conflicting evidence, we believe the trial court's award of damages is supportable as an allowance of compensation for services performed up to the time defendant exercised its right to terminate the contract in December 1970.

Nevertheless, we do not base our decision to affirm the judgment on such grounds. Whatever may have been the parties' original agreement, it was competent for them, before any breach of its provisions, to waive, dissolve or abandon that contract and substitute a new oral contract by conduct and intimation, as well as by express words.[1] Again, without recit-

1. *Smith v. Githens,* 271 S.W.2d 374, 380[19] (Mo.App.1954); *Opdyke & Butler v. Silver,* 111 Cal.App.2d 912, 245 P.2d 306, 308–309 (1952); 6 A. Corbin, Contracts § 1294 (1962); 6 S.

ing all the conflicting evidence in wearisome detail, it is apparent from a reading of the whole record that plaintiffs' performance did not follow the discrete and distinctive steps to which the "letter of intent" looks; rather, almost from the outset, plaintiffs actually undertook to design, contract for and supervise construction of the project as a whole, whatever they may now say their obligation was. And, in our view, it is indisputable that defendant breached the contract by repudiation when Muff told Pallardy "the hell with it", and advised him that defendant would proceed no further. What plaintiffs were entitled to recover was the contract price, based to the extent possible on the *actual* cost of construction,[2] less the amount it would have cost them to complete performance of their contract. *Sides v. Contemporary Homes,* 311 S.W.2d 117, 120–121[5–7] [8] (Mo.App.1958); *Schwalbe v. Postle,* 73 Colo. 181, 214 P. 388, 389[2] (1923); *Johnson & Burns, Inc. v. Hayden,* 98 Conn. 185, 119 A. 50, 52[5] (1922); *Gould v. McCormick,* 75 Wash. 61, 134 P. 676, 679[3] (1913); C. McCormick, Damages § 142, at 585–586 (1935). The actual cost of construction is shown by the record, but there is no proof of the cost of plaintiffs' performance. Having failed to prove their damages, plaintiffs are in no position to complain of the trial court's award, and the judgment of the trial court is affirmed.

All concur.

---

Williston, Contracts § 1828 (rev. ed. 1938). There is no contention that the contract here involved is a contract under seal, nor does it appear that the Statute of Frauds, § 432.010, RSMo 1969, V.A.M.S., applies to prevent recovery.

2. See *Lawton v. Roseno,* 125 App.Div. 628, 110 N.Y.S. 14, 15 (1908); 6 C.J.S. Architects § 36, p. 504 (1975).