THIRTY–THREE VENTURERS, INC., et al., Plaintiffs-Appellants-Respondents,

v.

John M. DICKEY et al., Defendants-Respondents,

and

Henry Salisbury and Cecil Van Tuyl, Defendants-Respondents-Appellants.

KCD 29245, KCD 29246.

Missouri Court of Appeals, Kansas City District.

July 31, 1978.

George T. O'Laughlin, Kansas City, for appellants.

Donald H. Loudon, Kansas City, for respondents.

Before WELBORN, Special Judge, Presiding, PRITCHARD, J., HIGGINS, Special Judge.

ROBERT R. WELBORN, Special Judge.

This case is another phase of litigation over the purchase of stock in five Missouri banks. The litigation here involved arose out of the transaction described at length in *Dickey, et al. v. Johnson, et al.*, 532 S.W.2d 487 (Mo.App.1975). A second case involving the transaction is *Dickey v. Thirty-Three Venturers, et al.*, 550 S.W.2d 926 (Mo.App. 1977). In the present action the purchasers sought to recover from sellers damages for alleged breach of warranties as to the book value of the stock purchased and as to the collectibility of the banks' receivables, sums claimed owed by sellers to buyers under provisions of purchase contracts wherein sellers agreed to indemnify purchasers against costs, expenses and attorneys fees occasioned by breaches of warranties, and refund of interest paid by purchasers on purchase money notes. Trial court denied recovery on claim for damages for breaches of warranty, allowed recovery of $7,748.94 attorneys fees and $30,250 for audit expenses, and denied refund of interest payments. Purchasers have appealed from such judgment. Two sellers appeal from award with respect to audit expense insofar as it makes sellers jointly and severally liable for that expense.

John M. Dickey, William Hines, Edward A. Appleton, Robert E. Dorsey, Cecil Van Tuyl and Henry Salisbury owned the controlling interest in five Missouri banks: The Bank of Otterville, The Harris Banking Company (now Citizens Bank of Newtown), The Hopkins State Bank, The Bank of Craig and The Security State Bank of Brookfield. On October 16, 1970, these persons, according to their stock ownership, entered into five separate contracts for the sale of their stock to five single bank holding companies wholly owned by Rudy Johnson as follows: Hopkins State Bank to Thirty-Three Venturers, Inc.; Bank of Craig to Thirty-Four Venturers, Inc.; Harris Banking Company to Thirty-Five Venturers, Inc.; Bank of Otterville to Thirty-Six Venturers, Inc., and Security State Bank to Thirty-Seven Venturers, Inc. The contracts of sale were practically identical and the transaction was a "package deal." As the contracts were amended by supplements, the sales price was fixed at 185.2% of the book value of the sellers' stock. The sellers warranted that the book value of all stock to be acquired from the sellers in the five banks would not, in the aggregate, be less than $1,100,000.00 as of December 31, 1970. On that basis the purchase price was fixed at $2,000,000 and was paid by $700,000 cash and $1,300,000 in promissory notes of the purchasers, allocated among the sellers in accordance with the proportionate book value of each of the banks and the sellers' holdings in each bank.

The contracts also provided that if, at time of closing of the transaction, principal or interest on any receivable was in default for at least 30 days or if a regulatory authority had classified any receivable as "doubtful, loss or similar category," and buyer notified sellers prior to time the receivable was in default for 90 days after closing or within 90 days of receipt of notice from regulatory authority, sellers would have 180 days to cure the default. Upon their failure to do so, the buyers were given the right to reduce the principal balance of any promissory notes issued to the sellers by 185.2% of the unpaid principal balance and interest of such receivables.

The sellers were, at the time of the sales agreements, in difficulty with the State Commissioner of Finance and the Federal Deposit Insurance Corporation, which insured deposits in all of the banks except the Bank of Craig. The F.D.I.C. had issued "Findings of Unsafe and Unsound Banking Practices and Order of Correction" in 1969 and had ordered a hearing on the termination of the insured status of the four banks covered by it. Among the subjects of criticism and grounds for action by the agencies were "insider" loans. At an October 20, 1970 setting of the hearing on the F.D.I.C. terminating order, an agreement was entered into by the four banks insured by F.D.I.C. to the effect that any contract for the sale of the banks should include a provision by which the sellers would agree to collect for the benefit of the banks or purchase at book value certain insider loans and overdrafts within 180 days of closing the sale.

By supplement to the October 16 contracts, the sellers bound themselves to the buyers to perform the F.D.I.C. commitment and agreed that default thereon would give buyers the right to reduce purchase money promissory notes by 185.2% of the unpaid principal and interest.

The sales transaction was closed in November, 1970. The purchasers paid $700,000 in cash and gave notes for the balance totalling $1,300,000.00.

Within a short time thereafter, examination on behalf of the purchasers of the receivables of the various banks gave rise to question of the accuracy of the representation that the book value of the sellers' interests in the banks amounted to $1,100,000.00. Under the contracts, any dispute in book value was to be determined by Peat, Marwick, Mitchell and Company, and the determination by that firm was to be binding upon the sellers and conclusive for all purposes of the sales agreement. An audit by that firm of the five banks as of December 31, 1970, disclosed an aggregate book value of the banks of approximately $700,000.00.

On February 25, 1971, the buyers notified the sellers in accordance with the contracts, that there were in the aggregate approximately $2,660,000 in uncollected receivables as of January 30, 1971. Demand was made that these receivables either be paid by the primary obligor or that the sellers pay those obligations within 180 days. Johnson, on behalf of each of the purchasing corporations, notified the sellers of his intention to exercise the right to reduce the balance due on the purchase money notes in case of any default not cured within 180 days.

The sellers did not assist in collecting the receivables but collections by the banks reduced the uncollected receivables to $2,000,000 in the 180-day period provided by the contracts.

Following the receipt of these notices, Dickey sued the buyers for a declaratory judgment regarding the meaning of various terms of the sales agreements. Eventually, on December 15, 1971, the five Venturer corporations entered into an agreement with the sellers which purported to settle all controversies between the parties. That is the agreement, specific performance of which was denied in *Dickey v. Johnson, supra.*

The matters presently in dispute originated as counterclaims in the *Dickey v. Johnson* litigation. They were reserved for separate trial upon the trial of that matter. Following the decision in *Dickey v. Johnson,* a separate action was filed on behalf of Johnson and the Venturer corporations, seeking essentially the same relief sought in the counterclaims. The two actions were consolidated and the parties realigned with Johnson and the Venturer corporations as plaintiffs and the individual sellers as defendants.

Essentially four matters, presented in numerous counts because of the separate purchase contracts involved, are involved in the litigation here under appeal.

1. Recovery of $740,800 for breach of warranty of the book value of the sellers' stock, plus $17,500 (amended at trial to $30,250) as one half of the cost of the audit made to determine book value.

2. Recovery based on warranty of collectibility of notes in the amount of 185.2% of the uncollectible notes in the portfolio of each bank as of November 28, 1970.

3. Recovery of attorneys fees and other costs and expenses based upon misrepresentations, breaches and nonfulfillments of sellers under the sales agreements. This claim was based upon a provision for indemnity against such expenditures, found in the sales agreements.

4. Recovery of $31,021.25 paid by the purchasers as interest on the purchase money notes. (Application, as of August 25, 1971, of the "charge-off" provisions of the purchase agreements eliminated the purchasers' liability on the $1,300,000 notes.)

With respect to the claims based upon warranties of book value and collectibility of the notes, the trial court found essentially that the agreements provided the sole remedy available to plaintiffs for such alleged breaches by allowing the buyers to charge back against the purchase notes a sum equal to 185.2% of the uncollectible receivables. The buyers took advantage of that provision to extinguish their liability on the notes and no further relief is available to them.

Paragraph 4 of each of the sales agreements provided:

"4. *Uncollected Receivables:*

"It is mutually agreed that the face value of all receivables of the Bank will be included in Book Value, * * * and (i) if, at any time after the Closing, the payment of principal or interest on any receivable due the Bank as of the Closing is in default by at least 30 days, or (ii) if any receivable due the Bank as of the Closing has been or is thereafter classified as doubtful, loss or in a similar category, by any regulatory agency having jurisdiction, Buyer may notify Sellers with respect thereto, if such notice is given in writing and prior to the time that such receivable is in default for a continuous period of 90 days after the Closing, or within 90 days of the date, on or after the Closing, upon which Buyer receives written

notice from such agency that such receivable has been so classified. Upon the giving of any such notice, and upon request by Buyer, if Sellers shall be unable, within 180 days from and after any such notification by Buyer, as stated above, to cure such default or remove such classification, then Buyers shall have the right to reduce the principal balance of any promissory notes issued to Sellers under this Agreement, or any of the other agreements referred to in paragraph 26 hereof, in an amount equal to (1) 185.2% of the unpaid principal balance and the interest due on such receivable at the date of such reduction, and (2) interest on the amount computed under (1) above at the rate of 7% per annum, from the Closing to the date of such reduction, unless Sellers shall, within the 180 day period provided above, purchase such receivable from the Bank for an amount in cash equal to the sum of (1) and (2) above. In the event Sellers purchase such receivable, and only in such event, said receivable shall be endorsed without recourse to Sellers."

By Supplement No. 2, a new paragraph 29 was added to the agreements by which in the event of nonpayment of the F.D.I.C. commitment, the buyer was given the right to "reduce the principal balance of any promissory notes issued to Sellers under this agreement * * *" by 185.2% of the amount of such unpaid obligation.

Supplement No. 2 also added the following new subparagraph to the "Sellers' Representations and Warranties":

"(s) That the Book Value of the shares of the Bank acquired hereby plus the Book Value of the shares of the other four Banks acquired pursuant to agreements substantially identical hereto, as of December 31, 1970, will not in the aggregate be less than $1,100,000, such aggregate Book Value to be as defined in paragraph 2 of the within Agreement and to be determined on the accrual basis in accordance with generally accepted accounting principals (sic); provided, however that in computing such Book Value, no deduction shall be made for (1) loans charged off after the Closing Date, (2) losses sustained on sale of bonds after the Closing Date, (3) expenses incurred after the Closing Date (other than interest paid on savings accounts and certificates of deposit) which exceed in the aggregate the expenses (other than the aforedescribed interest) incurred, as set forth on the books and records of the Bank, during the period November 25, 1969 through December 31, 1969, inclusive.

"Nothing contained herein or in the within Agreement to the contrary, in the event of the breach by Sellers of the warranties contained in subparagraphs (r) or (s) hereof, or in the event that either of such warranties is, for any reason, false or untrue, then any and all payments, whether of principal or interest, due from Buyer pursuant to the promissory notes issued in accordance with the within Agreement, or in accordance with any of the four agreements referred to in paragraph 26 of the within Agreement, shall be retained by Buyer rather than paid to Sellers until such breach of warranty, together with interest thereon at the highest legal rate from the date of breach thereof, shall have been fully cured. In the event that there is any dispute, regarding the amount of said Book Value on December 31, 1970, said Book Value shall be determined by Peat, Marwick, Mitchell & Co. and the determination by such firm shall be binding upon the Sellers, and conclusive for all purposes, under this Agreement. The fees of said firm for making such determination shall be divided equally between the Sellers and the Buyer."

Appellants Venturers and Johnson contend that the trial court's construction of these provisions and the resultant denial of relief to them on their claims for breaches of warranties were erroneous.

The trial court's conclusion was based primarily upon the meaning of paragraph 4 of the sales agreements which, by its terms, limited the redress of the purchasers upon nonpayment of the defaulted receivables to reduction in the principal amount of the purchase money notes by 185.2% of the amount due on such receivables. Appellants attack that conclusion on the grounds that the trial court overlooked the circum-

stances attending the transaction, which, they contend, would call for the conclusion that the parties did not, by paragraph 4, intend to limit the purchasers to the remedy there provided.

The circumstances relied upon by appellants are basically the deep troubles in which the banks were with regulatory authorities, particularly the F.D.I.C. The F.D.I.C. was threatening to cancel its insurance in the four banks covered by it because of mishandling of their affairs. As appellants point out, cancellation of F.D.I.C. insurance would almost certainly have made the stock in those banks unsalable and might well have led to a closing of the banks and a resultant loss of the entire investment of the sellers in them. In these circumstances, appellants argue, the sellers were willing to accept warranty obligations which might turn out to be harsh, even to the extent of causing them practically to make a gift of their stock to the purchasers.

The trial court, in giving the reason for its conclusion, took these circumstances into consideration, but drew from them a contrary conclusion. He reasoned that concern for the demands of regulatory authorities was evident primarily in the Second Supplement which took note of the F.D.I.C. commitments but again gave the purchasers, upon default, the right to charge the 185.2% of amount thereof to "reduce the principal balance on any promissory note issued to Sellers * * *." The repetition in the supplement of the "charge-off" language of the original agreement was found significant as evidencing an intention to limit the buyers to that remedy.

As respondents point out, cases in this state involving sales of goods have held that parties to a contract of sale may by their contract limit a purchaser's remedy for breach of warranty to that provided by the contract, *Mayfield v. George O. Richardson Machinery Co.*, 208 Mo.App. 206, 231 S.W. 288, 290–291[2] (1921); *Minneapolis-Moline Power Implement Co. v. Wright*, 233 Mo.App. 409, 122 S.W.2d 397, 399[1] (1938). Those cases involved an attempt by the purchaser to employ a remedy other than

that specified by the contract, but not in addition to the contractual remedy. In this case, appellants have already taken advantage of the contractual remedy and are now asserting the right to additional relief.

The trial court noted the practical effect of granting appellants the relief which they here seek. The amount of defaulted receivables had been reduced from $2,666,842 at the time of the notice to the sellers pursuant to the contract to approximately $2,000,000 on the charge-back date of August 25, 1971. From that date until the time of trial, there had been additional collections of $1,600,000.00. In addition, the Brookfield bank had been sold in December, 1971, for $655,000; the Harris (Newtown) bank in 1973 for $149,000, and the Otterville bank in 1974 for $350,000.00. Appellants assert a right to recover 185.2% times the $2,200,000 charge-back items as of August 25, 1971, plus 185.2% times the deficiency of some $400,000 in warranted book value. Appellants acknowledge overlapping of the claim based upon the charge-back and deficiency in book value and state that they would be willing to accept as the least to which they are entitled the return of their $700,000 cash payment. This latter alternative would at least leave their investment at nil, rather than having respondents pay them for taking over the banks, the result which would follow allowance of appellants' claim in full.

Insofar as the claim based upon warranty of book value is concerned, again the trial court noted that the parties were not seriously concerned about such a warranty and that it was inserted primarily to assuage the lending institutions financing the purchase. When the warranty terms were written, they included provision for remedy in the event of breach of the warranty. The obligation of the purchasers under the purchase agreement was to be suspended until the breach had been cured. The trial court concluded that this was the sole remedy and that, in view of the receivables collected, the breach had been cured.

In their reply brief, appellants argue eloquently that consideration of what had hap-

pened to the defaulted receivables since August 25, 1971 ignores the fact that any improvement in that regard was for the benefit of the banks and none was for the account of the purchasers. That is, of course, true, but equally obvious is the fact that any improvement in the status of the banks' receivables was reflected in the value of the stock which appellants purchased, and undoubtedly contributed to the profitable sale of three of the banks.

■ Appellants cite only general authority to the effect that in construing a contract all relevant surrounding circumstances tending to throw light upon the parties' intentions must be considered. The rule relied upon is not to be questioned. However, as demonstrated, the trial court did consider the circumstances relied upon by appellants. Under the standard of review for this court-tried case, there having been no demonstration that the trial court's judgment was without substantial evidentiary support, or that it erroneously declared or applied the law (*Murphy v. Carron,* 536 S.W.2d 30 (Mo. banc 1976)), the trial court's judgment on this issue must be sustained.

The appellants' claim for reimbursement for attorneys fees arises out of the following provision found in each of the sales contracts:

"23. *Indemnity:*

"Sellers do hereby agree, pro rata in proportion to the number of shares sold by them hereunder, to indemnify Buyer from any damage, loss, cost or expense incurred by it resulting from any misrepresentation, breach of warranty or nonfulfillment of Sellers hereunder. The indemnified party shall be reimbursed on demand for any payment made or loss suffered by it, with respect to which this indemnity relates, and for any attorney's fees, costs or expenses incurred in connection therewith, together with interest thereon at the maximum legal rate from the date of demand; provided that Sellers shall not be required to pay any * * * expenses relating to any litigation, unless they shall have been given timely written notice of the existence of such litigation and an opportunity to participate in the defense thereof."

Appellants presented evidence that they had incurred attorneys fees in excess of $277,500 in various matters arising out of the sales transaction. They included: efforts to collect the delinquent receivables in the hands of the banks; the handling of an interpleader action in the Federal Court in which Johnson and the Venturer companies were parties and which involved the assertion of a claim to collateral held by the Columbia Union Bank which financed the purchases here involved; the defense of the specific performance action by the sellers which eventually found its way to this court (*Dickey v. Johnson,* supra); litigation for the purpose of collecting Dickey's obligations (*Dickey v. Thirty-Three Venturers,* supra); and the present litigation. Attorneys fees were also incurred in dealing with regulatory authorities following the purchase of the banks, particularly in dealing with the demand of the F.D.I.C. for the infusion of additional capital into the banks.

Appellants contend that these expenditures were necessitated by the breaches of warranty and misrepresentations of the sellers and that they are entitled to be reimbursed therefor under the above contract provision. The trial court allowed only one item of legal fees arising out of the handling of an action against the Harris bank by the First Bank of Grantsburg, Wisconsin, which had not been revealed to the purchasers prior to the closing of the transaction. The court found that this was a matter expressly warranted against in paragraph 8(k) of the sales contracts and that the provision for indemnification was intended to apply in such case but did not apply to the other items.

Appellants contend that the disallowed expenditures arose out of (1) the failure by certain sellers to honor personal note obligation, (2) the failure of other sellers to honor the warranty obligation of the F.D. I.C. commitment and (3) the failure of the sellers to honor the warranty agreement in paragraph 4 of the sales contracts. Appellants contend that the expenses incurred as

a result of such defaults on the part of the sellers falls within the clear and unambiguous language of the indemnification provision which calls for the sellers " * * * to indemnify Buyer [appellants] from any damage, loss, cost or expense incurred by it resulting from any misrepresentation, breach of warranty or non-fulfillment of Sellers hereunder."

■ Viewing the language of paragraph 23 in its entirety, the trial court's construction of the provision is not to be held erroneous. The broad general language relied upon by appellants must be viewed in the light of the entire paragraph. Particularly, attention and meaning must be given the last clause of the paragraph which provides:

" * * * Sellers shall not be required to pay any * * * expenses relating to any litigation, unless they shall have been given timely written notice of the existence of such litigation and an opportunity to participate in the defense thereof."

This provision contemplated that the litigation for which indemnity would be provided was litigation *against* the purchasers, not litigation by them and certainly not litigation against the sellers. The contracts gave the buyers remedies against the sellers for breaches of the warranties on the receivables and the book value. There is no basis for attributing to the parties an intention in the indemnity clause to provide additional remedies for such breaches. The above-cited language clearly mitigates against such an intention insofar as expenses of litigation are concerned. The contracts also provided the remedy for breach of the warranty as to book value. The indemnity clause does not require the sellers to pay the legal fees arising out of regulatory authorities' demands which appellants relate to the deficiency in book value.

Appellants here rely upon general principles to overturn the trial court's ruling. Under the scope of review prescribed by *Murphy v. Carron,* supra, the trial court's ruling has not been demonstrated to have been erroneous.

Appellants next contend that the trial court erred in failing to adjudge that they are entitled to refund of interest payments totalling $31,021.25 made by them on the purchase price notes prior to the time that the liability represented by the notes was extinguished under the "charge-back" provisions of the sales contracts. Appellants rely upon the following provision found in the notes:

"This promissory note is issued pursuant to the terms and provisions of the above described Agreement for Sale of Stock, and the amount payable hereunder is subject to adjustment by virtue of the terms and provisions of said Agreement, to which reference is hereby made, and which are, by such reference, made as fully a part of this promissory note as if the same were set forth at length herein."

■ Appellants contend that when their obligation to pay the notes terminated by virtue of the charge-backs, the above quoted provision contemplated an "adjustment" which would entail return of the interest payment made under the conditional notes that were subsequently voided. Appellants overlook the language that the "adjustment" was to be made "*by virtue of the terms and provisions of said agreement* * * *.*" The "terms and provisions of said agreement" which relate to adjustment of the amounts payable under the notes are found in paragraph 4, quoted above. The adjustment provided for is reduction of "the principal balance of any promissory notes issued to Sellers * * *." That is the "adjustment" referred to in the notes and relates only to reduction in the "*principal balance*" and makes no reference to any adjustment of interest which had accrued and been paid prior to the adjustment of the principal balance. That being the situation, general definition of the term "adjustment" is irrelevant because the parties have provided what is to be done in that regard. The trial court's denial of relief was correct.

Sellers Salisbury and Van Tuyl have appealed from the portion of the trial court's judgment which renders them jointly and severally liable with other defendants for

$30,250 plus interest from July 21, 1971, for the defendants' share of the audit fees incurred upon the audit of the five banks. The audit was required when a dispute arose as to the book value of the stock being sold in all banks and was made pursuant to the terms of paragraph 6 of Supplement No. 2 to each of the sales contracts, which called for an audit to be made by Peat, Marwick, Mitchell and Company in the event of such a dispute. Paragraph 6 further provided: "The fees of said firm for making such determination shall be divided equally between the Sellers and the Buyer."

Salisbury was one of the sellers of stock in the Harris Banking Company (Citizens Bank of Newtown). Thirty-Five Venturers, Inc., was the buyer. Van Tuyl was one of the sellers of stock in the Citizens Bank of Brookfield and Thirty-Seven Venturers, Inc., was the buyer. Peat, Marwick, Mitchell and Company rendered separate bills for the audit of each of the five banks. The charge for the Brookfield bank was $18,150 and for the Harris bank $8,450.00. Van Tuyl contends that his liability for audit expense should be limited to one half of the cost of the Brookfield audit. Salisbury would limit his liability to one half of the cost of the Harris audit.

■ Giving the judgment of the trial court the benefit of the presumption of correctness (*Pallardy v. Link's Landing, Inc.*, 536 S.W.2d 512, 515[1, 2] (Mo.App. 1976)) and applying the *Murphy v. Carron*, supra, rule of scope of review, the trial court's conclusion is not to be overturned. The provision for the audit was found in the supplement to each of the contracts. The warranty as to book value was as to an aggregate value for the five banks. There was no warranty as to the value of each bank, separately. The provision for an audit did not contemplate the audit of a single bank, but, as occurred, an audit of all five. The buyers agreed, without limiting their liability to the cost of the audit of the bank in which they held stock, to pay one half of the cost of the audit. The trial court's judgment is not erroneous.

Judgment affirmed.

All concur.