**In re the MARRIAGE OF BROOKS.**

**Dorothy Grace BROOKS,
Plaintiff–Respondent,**

v.

**William Allen BROOKS,
Defendant–Appellant.**

**No. 15618.**

Missouri Court of Appeals,
Southern District,
Division Two.

March 27, 1989.

John Z. Williams, Williams & Crump,
Melvin E. Carnahan, Carnahan, Carnahan
& Hickle, Rolla, for defendant-appellant.

Dan L. Birdsong, Thomas, Birdsong,
Clayton & Haslag, Rolla, for plaintiff-respondent.

HOGAN, Judge.

The parties to this action were divorced in 1985. They executed a separation agreement which required the defendant to pay plaintiff the sum of $1,550 per month as maintenance until the plaintiff began to receive one-half of certain retirement benefits to which the defendant would become entitled at age 65. The separation agreement was incorporated in the decree. On November 12, 1987, plaintiff sued out an execution on the judgment for maintenance as permitted by § 452.325.5, RSMo 1986.[1] The defendant is a part-time employee of the University of Missouri–Rolla and by virtue of the provisions of Rule 90.22(a) the execution constituted and served as a writ of sequestration. Defendant William Allen Brooks (hereinafter defendant) moved to quash the writ of sequestration on the ground that the judgment for maintenance had been fully satisfied. Inasmuch as the writ of sequestration was in fact a general execution, it was proper to determine on motion whether the execution was supported by a valid, unsatisfied order, decree or judgment. *Woods v. Woods*, 236 Mo. App. 855, 159 S.W.2d 320, 323[6] (1942). The trial court refused to quash its writ of sequestration and the defendant appealed.

The separation agreement which is the subject of this proceeding was executed October 23, 1985, in contemplation of divorce as provided by § 452.325.1. It contains the following provisions material to this appeal:

"3. *Retirement and Annuity Benefits.* The intention of this section of the Agreement is for WIFE to receive her share of HUSBAND'S retirement benefits. WIFE shall receive future division of HUSBAND'S retirement benefits, if, as and when received. *The following retirement and annuity plans are cov-*

---

1. References to statutes and rules are to RSMo 1986 and V.A.M.R., except where otherwise noted.

*ered by the terms and conditions of this Agreement:*

(a) University of Missouri Retirement Plane [sic], from which HUSBAND shall be entitled to receive $845.46/per month (estimated) at age 65; If HUSBAND takes late retirement after age 65, any additional benefits shall be his sole and separate property.

(b) Teachers Insurance and Annuity Association (TIAA) Plan, having a present accumulation of $34,116.86 (monthly amount not yet ascertained);

(c) College Retirement Equities Fund (CREF) Plan, having a present value of $34,478.22 (monthly amount not yet ascertained).

The Plan Administrator of each of the above-named plans shall pay to WIFE payments based upon a percentage of HUSBAND'S retirement benefits, if, as and when received. The percentage payment shall be FIFTY PERCENT (50%) of all payments and benefits due to HUSBAND upon his retirement or, at other times described in the applicable plan when benefits can be received by HUSBAND upon request. To the extent possible, WIFE'S fifty percent (50%) of such benefits shall be paid directly to WIFE by the Plan Administrator of each of the above-named plans.

\* \* \* \* \* \*

HUSBAND shall take no steps, which are in his power to avoid, which will cause a forfeiture of pension benefits; and loans from any of the above-described retirement plans and annuities subject to the terms of this section of the Agreement are strictly prohibited.

\* \* \* \* \* \*

D. MAINTENANCE

1. The parties agree, after examining all relevant factors, including the situation of both parties at the present time, that it is reasonable for and HUSBAND agrees to pay to WIFE $1,550.00 per month as maintenance. Such maintenance payments shall be made in trust for Dorothy Brooks to the Circuit Clerk of Phelps County, Missouri. The payments shall be made in advance on the first day of each month commencing October 1, 1985, *and shall continue until WIFE begins to receive one-half of all retirement benefits to which HUSBAND may become entitled as a result of his participation in the UMR Retirement Plan earned up to age 65*, the TIAA Retirement Plan, and the CREFF Retirement Plan. *Upon WIFE'S receipt of these benefits, HUSBAND'S obligation for the $1550.00 per month maintenance provided herein shall cease.* More detailed provisions on the division of retirement benefits [are] set forth in paragraph A–3 hereof." (Emphasis added.)

\* \* \* \* \* \*

The defendant paid maintenance to the plaintiff until the fall of 1987. The plaintiff sued out an execution, as we have noted, on November 12, 1987. The docket sheet indicates a writ of sequestration was issued on December 2, 1987. Upon motion to quash the writ of sequestration, the trial court heard evidence and refused to quash the writ. That part of the evidence which bears on the appeal is as follows.

The defendant retired from full-time employment as a tenured, full professor at the University of Missouri at Rolla effective September 1, 1987. The chairman of the defendant's department, Yildirim Omurtag, was dissatisfied with "faculty availability and presence on campus." Defendant was teaching at Rolla but he was living in Columbia. Defendant was present on the Rolla campus only two days a week. According to Omurtag, "[t]wo days a week was just not enough." Omurtag discussed early retirement with the defendant. The choice put to the defendant was that he could take early retirement or be on the campus full time. It was within the chairman's discretion to arrange classes so the defendant would be obliged either to move back to Rolla or retire. Omurtag explained that he was generally familiar with the faculty retirement program, and if a teacher takes early retirement, no more retirement benefits accrue "unless arrangements are made for him to be significantly employed." Teaching one or two courses as

an adjunct professor did not, according to Omurtag, increase retirement benefits. Omurtag made it plain that he had no authority to force the defendant to retire. He further testified that under the University's early retirement program, the retiree is given a "lump sum of money" which is in essence an inducement to all employees who choose early retirement. The amount paid on early retirement is computed according to a formula, Omurtag stated, and in defendant's case the severance pay would come to "somewhere around fifty thousand."

The defendant offered several reasons for his early retirement. Defendant's explanation of his frequent absence from Rolla was stated thus:

"Well, UMR—at various places. Every seven years a professor is supposed to have sabbatical. For budget reasons we [had] not had one. So Dr. Omurtag said 'Well, it's time that you had one. And we can't give you one. So we would like to relieve your assignments and give you some time to refresh yourself and will do this by reducing your teaching course—or teaching load from three courses to two and we'll schedule these on Tuesdays and Thursdays.' "

This arrangement continued through 1986 and for the spring semester in 1987. Defendant was then, by his own testimony, "encouraged ... to retire." In part, the defendant considered his retirement desirable because "... Columbia is where the lady I married was living. Because she had moved from Rolla to Columbia in July of '85." Defendant was asked why, if he was presented with an alternative, he could not move to Rolla. He answered thus:

"The reason was, that when I did marry, which came about very rapidly, I moved into the house that Pam and the three children were living in. And Pam had moved to Columbia to go to school, to prepare herself—she's a widow—and the children were in school and doing very well. And so her—she didn't want to move to Rolla. She had just moved from Rolla to Columbia. Therefore, I

was faced—we had some very, very difficult times there trying to decide what to do....

Q. But the essence is, she did not want to move back to Rolla?

A. In essence, there was no way I could get her to move to Rolla."

Defendant had other reasons to consider early retirement. In July 1985, while he was abroad, the defendant developed arrhythmia. He returned to the United States, where his condition was diagnosed as "atrium fibrillation." The arrhythmia initially responded to medication but returned in September 1986. Since that time, the defendant's arrhythmia had recurred sporadically.

The defendant finally decided to enter into an early retirement agreement with the University of Missouri. The agreement is dated April 27, 1987. It recites that the defendant has requested retirement under the University's early retirement program; that he is a tenured professor and holds a continuous appointment under the University's rules; that the parties agree it would be in their respective interests for the defendant to retire, and therefore, 1) the defendant agrees to retire, effective August 31, 1987, and 2) the University agrees to pay the defendant the sum of $51,638.40, in addition to any regular salary to which the defendant is entitled. The agreement specifically recites that it shall not detrimentally affect "any benefits or privileges" which the defendant may have as a retired employee of the University. The agreement also provides that the defendant may be eligible for part-time, multi-year employment after retirement.

At the time of the hearing, the defendant had arranged to teach two courses in St. Louis. He was to receive $10,000 as remuneration. In the fall of 1988, the University was to pay the defendant $3,500 per course. Defendant had a possible earning capacity of $17,000 for the fall semester of 1988.

The defendant then testified to his employment status. He was employed, on a semester-to-semester basis, with no tenure or guarantee. He was earning no further

retirement benefits working as a part-time instructor. The defendant introduced his exhibit C which indicated that he and his former wife had been receiving $348.43 per month from the University's Retirement, Disability and Death Benefit Plan. The defendant also testified, without objection, that the plaintiff had either begun to receive the annuities due her or could apply to receive them at her volition. The plaintiff testified that at the time of trial, she was receiving $348.43 monthly from the University's retirement fund and $388.94 monthly from the other retirement funds which had been assigned to her. Plaintiff also testified that if the defendant had elected to retire at 65, she would have received $350 per month in Social Security benefits and would therefore have received, approximately, the amount she received as maintenance.

The question raised by the motion to quash was whether the defendant's obligation to pay maintenance had been terminated so there was no longer any valid basis for the issuance of a general execution. We do not know the basis for the trial court's decision. The parties made no request for findings and the court volunteered none. All issues are therefore deemed to be found in accordance with the judgment, and the judgment is to be affirmed if that can be done under any reasonable theory presented by the evidence. *Telge v. Telge,* 677 S.W.2d 403, 405 (Mo. App.1984); *Porter v. Posey,* 592 S.W.2d 844, 848 (Mo.App.1979).

The defendant has briefed a single point on appeal. As stated, his point is that the trial court erroneously refused to quash the writ of sequestration because the defendant's obligation to pay maintenance had terminated. The defendant suggests plaintiff's position is that pursuant to the separation agreement defendant was to continue working until he was 65, that she was to receive $1,550 per month as maintenance, and thereafter by reason of her receipt of one-half of defendant's retirement benefits and her own social security benefits plaintiff was to receive approximately $1,500 per month. The defendant has isolated and quoted parts of the separa-

tion agreement, arguing that his obligation to pay maintenance terminated at such time as he could receive benefits on request. In our view, if there is a governing rule of construction, it is that contracts are to be interpreted so as to reach fair, practical and reasonable results, for it is presumed that the parties contracted to that end, *Buffalow v. Bull,* 619 S.W.2d 913, 923 (Mo.App.1981), and as the court there stated, a contract is not rendered ambiguous by the fact that the parties do not agree upon the interpretation it is to be given. *Buffalow v. Bull,* 619 S.W.2d at 923. We are not impressed with the defendant's argument that his duty to pay maintenance terminated at such time as retirement benefits became available to him and the plaintiff.

We must consider, among other things, that when the contract was made, defendant's early retirement cannot have been within the parties' contemplation because the early retirement procedure of which the defendant took advantage was initiated in 1986, after the separation agreement was executed. It is reasonable to suppose that the parties, having agreed that $1,550 per month maintenance was a reasonable amount, would also conclude that to the extent possible, the plaintiff should continue to receive substantially the same amount when the defendant retired. The event which provoked controversy in this case, in our opinion, was the defendant's early retirement. To give the opinion some form, we prefer to approach the question presented in a manner somewhat different from that utilized by the parties.

In our view, it may fairly be said that paragraph D1 of the separation agreement obliges the defendant to pay the plaintiff $1,550 per month until she begins to receive one-half of all retirement benefits which would have been earned by the defendant if defendant had worked until he became 65. Plaintiff's monthly receipt of one-half of defendant's retirement benefits earned to age 65 is a condition subsequent which operates to discharge defendant's

duty to pay maintenance.[2] The defendant made no proof what that amount would have been, but the record makes it appear that the amount is calculable; even if the precise amount is not ascertainable from the face of the original decree, the court could have determined the exact amount upon motion and proof of the University's retirement plan. See *Telge v. Telge*, 677 S.W.2d at 407. We cannot say that the amount plaintiff would receive upon defendant's early retirement is either more or less than she would have received had defendant chosen to work until he was 70. We are convinced that the defendant was obliged to show that the amount plaintiff would receive in retirement benefits was not diminished by his early retirement. The defendant was not entitled to time his retirement so as to deprive the plaintiff of an equal share in his retirement benefits, *In re Marriage of Gillmore*, 29 Cal.3d 418, 174 Cal.Rptr. 493, 629 P.2d 1, 4[3] (1981), nor is the plaintiff entitled to share in the defendant's early retirement benefits. *Biddlecom v. Biddlecom*, 113 A.D.2d 66, 495 N.Y.S.2d 301, 303 (1985). We are aware that defendant testified he was earning no more retirement benefits, but he did not testify that he could not have earned further retirement benefits if he had elected to teach until he became 65. Defendant had the burden to prove discharge of his duty to pay maintenance by occurrence of the condition subsequent, J. Calamari and J. Perillo, Contracts § 11–5, p. 387, and he simply did not do so in this case.

The defendant suggests that any limitation upon his decision to take early retirement would impose a servitude upon him. The argument is inapt. A court of law may not compel a person to continue in any particular employment, *In re Marriage of Jadwin*, 671 S.W.2d 9, 11 (Mo.App.1984); *In re Marriage of Smith*, 652 S.W.2d 743, 744[3] (Mo.App.1983), but by the same token a husband may not escape from nor frustrate a trial court's efforts to provide maintenance by voluntarily reducing his in-

come. *In re Marriage of Jadwin*, 671 S.W.2d at 10; *Klinge v. Klinge*, 554 S.W.2d 474, 476 (Mo.App.1977). In any event, in this proceeding, the trial court could not change the agreement of the parties. The maintenance provision of this decree was incorporated in the decree and part G3 of the agreement provided that the terms thereof were not subject to modification. The trial court was therefore without authority to modify the terms of the decree regarding maintenance. Section 452.325.6; *Seip v. Seip*, 725 S.W.2d 134, 136 (Mo.App. 1987); *Davis v. Davis*, 687 S.W.2d 699, 701–702 (Mo.App.1985).

The order entered was presumptively correct, and the defendant had the burden to demonstrate error. *Pallardy v. Link's Landing, Inc.*, 536 S.W.2d 512, 515 (Mo. App.1976). Defendant has demonstrated no error materially affecting the merits of the action and we must affirm. Rule 84.-13(b). Accordingly, the order refusing to quash the writ of sequestration is affirmed.

FLANIGAN, P.J., and PREWITT, J., concur.

---

**2.** A condition subsequent is defined as any fact, the existence or occurrence of which, by agreement of the parties, operates to discharge a duty of performance after it has become absolute.

Restatement, Contracts § 250(b) (1932), J. Calamari and J. Perillo, Contracts § 11–5, p. 385 (2d ed. 1977).